[No. B017565. Second Dist., Div. Five. Nov. 9, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR JACOBS et al., Defendants and Appellants.

1638

**COUNSEL**

Daniel Ritkes and Frank O. Bell, Jr., State Public Defender, under appointments by the Court of Appeal, Monica Knox, Acting State Public Defender, James A. Uyeda, Deputy State Public Defender, and for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John R. Gorey and William R. Weisman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

EPSTEIN, J.*—Defendants Arthur Jacobs (Jacobs) and Thomas Owen (Owen) were jointly tried and each convicted of second degree murder (Pen. Code, § 187)[1] and assault with a firearm (§ 245, subd. (a)(2)). The jury also found that Jacobs had been armed with a shotgun (§ 12022, subd. (a)), and that Owen had personally used a shotgun in the commission of the crime (§ 12022.5). Jacobs was sentenced to an aggregate term of 20 years to life in state prison. (The term was comprised of fifteen years for second degree murder, one year for the armed enhancement, and four years for the assault conviction.) Owen was sentenced to a term of 21 years to life (15 years for second degree murder, 2 years for the firearm use enhancement, and 4 years for the assault). Each defendant has appealed from the judgment against him.

Jacobs argues that the trial court committed reversible error in admitting Owen's pretrial statements in their joint trial. Owen presents three assignments of error: insufficiency of evidence, prejudice from a courtroom demonstration, and prosecutorial misconduct.

We conclude that there is harmless error as to Jacobs, and no error as to Owen. We therefore affirm both judgments.

### FACTUAL SUMMARY

In the following summary, we resolve all factual evidentiary disputes in favor of the judgments. (See *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781].)

On May 15, 1983, Mrs. Jean Singrin and her 20-year-old daughter, Lise, spent the evening together. Following dinner at a local restaurant, they returned to their home in Long Beach. Mrs. Singrin retired to her bedroom, while Lise remained in the den. As Mrs. Singrin began to fall asleep, she heard her daughter yelling in an angry, indignant and strident voice, "Get away from me. Get away from me. Leave me alone. Don't touch me. Get away from me. Get away from me. Leave me alone." Mrs. Singrin rushed from her bed to aid Lise. As she ran past Lise's bedroom door, she was grabbed by a man, who pulled her close to his body. She did not get a good look at the man, but did observe that he had dark hair and a beard, a light

---

* Assigned by the Chairperson of the Judicial Council.
[1] All citations are to the Penal Code, unless otherwise indicated.

face, dark eyes, and was about six feet tall. The man said, "Don't yell. Don't scream. We aren't going to hurt her. Don't yell. Don't scream."

At the felony preliminary hearing, and again at the trial, Mrs. Singrin identified Jacobs as the man who had grabbed her. Her identification was based on his build, the feel of the man, and, most of all, his voice. She said that his voice was "etched" in her memory, and that she would never forget it.

Mrs. Singrin is a teacher of mentally retarded children in the Long Beach public schools. Voice and speaking characteristics are very important to her in her work, and she is conscious of voice at all times. Part of her assignment in the public schools is to teach the retarded children in her charge to speak better. Language development and speech patterns have been the primary emphasis of her teaching for 12 years. She was able to describe, compare and distinguish speech patterns of various persons in the courtroom, including the prosecutor, defense counsel and the judge.

Mrs. Singrin's identification of Jacobs also was aided by a demonstration conducted at the preliminary hearing and repeated at the trial. In this demonstration, Jacobs approached Mrs. Singrin in the manner that she described, and spoke to her. Following this, Mrs. Singrin confirmed her conclusion that Jacobs was her assailant; his voice and tone were the same as the man who had grabbed her.

Mrs. Singrin broke away from her assailant and ran towards the den. When she arrived, she found Lise screaming as another man was beating her with a shotgun. Mrs. Singrin later positively identified this man as Owen. She said that she was "one hundred percent" certain of her identification, and that she will never forget the face of the man who was assaulting her daughter. She saw him from the front, and from both sides.

In an effort to ward off the blows to her daughter, Mrs. Singrin spread her body over Lise. She was struck at least eight or ten times. She next remembers being on the floor, flailing her legs and feet in an effort to keep Owen's gun away from her. At that point, she heard Jacobs say in a calm voice, "lets get out of here," and both men then left the home. Mrs. Singrin stood up and saw blood beginning to pool on the floor. She then again lapsed into unconsciousness. Her next recollection is that of looking at a clock on a microwave oven; it showed 9:01. Several policemen were in the home. She later learned that her daughter was dead.

Mrs. Singrin was bruised on her arms and shoulders. She also suffered a laceration in one of her ears, which required sutures.

Mrs. Singrin identified Owen's photograph from a group of 12 in a photographic lineup about a year and a half later. The picture "leaped out" at her. She had carried Owen's image in her mind and had looked for him everywhere she went.

While only Mrs. Singrin, her daughter and the two assailants were in the Singrin home at the time of the attack, there were other percipient witnesses to the events. A neighbor of the Singrins, James Cook, lived across the street. He had been an officer of the Long Beach Police Department for 21 years. On this particular evening, his daughter and son-in-law, Randy Debois, were visiting. Just before 9 p.m., Mr. Debois heard screaming; the screaming lasted for several minutes. Mr. Debois could not identify the source of the screams. He then heard a loud, explosive noise, followed by silence. He alerted Mr. Cook, who looked toward the Singrin residence and saw two males walk from the house and around the corner. Mr. Cook and Mr. Debois then ran towards the intersection. Mr. Cook asked for Debois to keep the two men in sight by car.

As Mr. Debois followed the two men in his car, he saw them break out of a run and come toward him. His headlights shone fully on the man closest to him; he had dark hair and a long, full beard. Mr. Debois drove past the men, turned around, and drove past them again. He then turned the corner and parked with the lights off. He saw a man run down an alley.

Mr. Debois cooperated with a police sketch artist, who prepared a composite of the man Mr. Debois had seen in his headlignts. Some time later, after Mr. Debois had returned to his home state of Washington, he picked out Jacobs's picture from a photographic lineup. At trial, however, he was unable to positively identify Jacobs. By that time, Jacobs had changed his hairstyle and no longer wore a beard.

While Mr. Debois was following the two men, Mr. Cook went over to the Singrin residence. Entering, he found Mrs. Singrin dazed and asking for Long Beach police on the telephone. It was obvious from the massive injuries to Lise Singrin's head, that she was dead.

Long Beach police arrived about one minute later. Officer Thornfield testified that, based on shotgun remnants found at the scene, Lise had been struck by two shotgun shells. A homicide investigator concluded that she had been killed by a shotgun-inflicted injury; the den wall was covered with blood, hair and tissue. Later, after an autopsy, a deputy coroner testified that the massive damage to Lise's head had been caused by two shots; he concluded that a double-barreled shotgun had been used.

Lise Singrin's longtime friend, Lynn Kile, testified that she recognized Jacobs as the same person that she had met with Lise at Sal's Bar in 1981. Ms. Kile recalled seeing Jacobs six to eight times at another bar that she and Lise had frequented. Ms. Kile also remembered going with Lise to a house on Coldbrook Street which, according to another witness, was the home of Jacobs's mother.

The house on Coldbrook was about one-half block from Lakewood High School. Herbert and Ruby Holmes lived close to that school, but on a nearby street, Marwick. They recalled seeing Jacobs, Owen and Lise at the Sexton residence, a home adjacent to their own on Marwick. Mr. Holmes saw Lise at the Sexton home on two occasions, and saw her car (a blue Volkswagen) parked there "quite a bit." Mrs. Holmes had met and spoken with Lise during one of Lise's visits to the Sexton home. Mrs. Holmes also recalled seeing Lise at the Sexton home when Jacobs was present.

Mr. Holmes identified both defendants in court. He noted that Owen, who had been clean shaven, had grown a beard by the time of trial.

The Sexton house had been occupied by Richie Sexton, his mother, and his stepfather. Mr. Holmes had seen Richie Sexton inebriated by alcohol or drugs on several occasions. Mrs. Holmes had seen persons at the Sexton house who appeared to be on drugs. On one occasion, she heard a person who was sitting with Richie Sexton yell that they were getting some "Colombian gold." She was aware that Richie Sexton was a drug dealer, and derived his living from selling drugs.

Jeri Wyckoff had been Jacobs's girlfriend from 1977 until 1980; they remained friends after that. She had gone with Jacobs to Sal's Bar and to the other bar described by Ms. Kile. She said that she, Jacobs, or both of them, also had gone to the Sexton house for drugs. Sometimes Jacobs bought cocaine for her. Ms. Wyckoff also testified that she had been to the home of Jacobs's mother on Coldbrook.

About a month after the homicide, Ms. Wyckoff's father showed her a police composite drawing of Lise's assailant. Ms. Wyckoff thought that it closely resembled Jacobs. She was with Jacobs a few months after that, and she asked him if he was capable of committing murder. He responded by singing, "Murder is as easy as A, B, C."

The defendants were ultimately arrested. While in county jail awaiting trial, Owen made several inculpatory statements to two cellmates. These statements were admitted into evidence in redacted form, through the testimony of the two cellmates. The redaction eliminated all reference to Jacobs

by name; the phrase "the other guy" or a similar phrase was substituted whenever Jacobs's name would have been mentioned.

One of the cellmates was William Hamilton. As the jury heard Owen's statement as given by Hamilton, it was substantially as follows: Owen said that he would present a false alibi defense. He would say that he worked on a "oil island" (evidently, an offshore oil drilling or pumping platform; Owen actually did work at such a facility) and that it was difficult to get to the mainland without being noticed. Actually, it was an easy matter to leave the island, go to the mainland, and return. Owen said that on the night of the killing, "the other guy" had picked him up and that they had gone to "that girl's home" because his friend wanted to talk with her. He had taken a shotgun in order to scare the girl, but a fracas had erupted when the girl became hysterical. Her mother came running into the room. The shotgun discharged, killing the girl. Owen and his friend ran from the residence; they were followed and "hollered at" as they did so. Owen was taken back to work by "the other guy."

The other cellmate of Owen, Jonathan Sires, related a similar version of Owen's statement. According to his version, Owen implied that the visit to the girl was drug related. Owen said that he had brought along the shotgun. He said that the killing had been accidental; the gun went off when the girl's mother broke loose from the other person and went after Owen. Owen's statement, as related by Sires, also stated that "the other guy" had been seen by a man as they were leaving the girl's residence.

Each cellmate was impeached by evidence of prior felony convictions and by evidence indicating a motive to testify for the prosecution.

Each defendant presented an alibi defense. Jacobs testified that at the time of the murder, on May 15, he was in Desert Hot Springs visiting his sick mother. However, a friend of Mrs. Jacobs who was visiting at the same time testified that she had recorded the visit as having been on the day before, May 14. Jacobs denied ever having met Lise or being anywhere with her. He also denied receiving any telephone call from Owen during the visit to Desert Hot Springs. Telephone company business records indicated that two collect calls had been made to the location at which Jacobs's mother was staying from a number that Jacobs had listed as Owen's.

Owen did not testify. His work supervisor testified that, according to company work records, Owen had been on the oil island at the time that the crime was committed.

## DISCUSSION

 Jacobs's contentions on appeal all concern the admission of Owen's statements through the testimony of Owen's cellmates. He argued that these statements, even in redacted form, incriminated him and therefore should not have been admitted at the joint trial. Jacobs also urges that the jury should have been given a limiting instruction, restricting its consideration of the statements to the case against Owen. He refers to these issues, collectively, as "Aranda/Bruton Error."[2]

The respondent makes no claim that the cellmates' testimony of Owen's statements was admissible in the joint trial. Instead, it is argued that Jacobs failed to object to it on a proper ground, and that even if error was committed, it was harmless.

 Owen argues that the evidence is insufficient to support his conviction of second degree murder. He also insists that the trial court should not have permitted the demonstration in which Jacobs grabbed Mrs. Singrin. Lastly, Owen complains that the prosecutor was guilty of misconduct through the use of sarcasm in examination of Jacobs and one of the cellmates, by implying in argument to the jury that the reasonable doubt rule was not applicable, and, at the sentencing hearing, in referring to the fact that Owen had not testified.

### I. *Jacobs's Appeal*

#### A. *General Principles*

Prior to 1965, the confession by one of two defendants was admissible at their joint trial, even though it implicated the nondeclarant defendant. It was considered that a standard limiting instruction, admonishing the jury that it could only consider the confession against the defendant who made it, was a sufficient protection. (See Witkin, Cal. Criminal Procedure (1985 Supp.) Trial, § 293A p. 375.) That practice was significantly changed in 1965 by *People* v. *Aranda*. The Supreme Court expressed serious doubt about the constitutionality of the practice, but felt obliged to rest its decision on nonconstitutional grounds in light of United States Supreme Court precedent that appeared to sanction it. (*Aranda, supra,* 63 Cal.2d at pp. 529-530.) The rules it adopted were therefore stated as "judicially declared rules of practice to implement section 1098" (the Penal Code provision governing joinder and severance of defendants; *id.,* at p. 530). The rules themselves

---

[2]From *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] and *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620].

were summarized in a single paragraph: "When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established. (2) It can grant severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible. Similar rules concerning joint trial have been adopted in other jurisdictions and have been found workable. [Citations omitted.]" (63 Cal.2d at pp. 530-531; fns. omitted.)

The court's skepticism about the constitutionality of the federal rule was well founded. Three years after the *Aranda* decision, the United States Supreme Court decided *Bruton* v. *United States, supra,* 391 U.S. 123.) The *Bruton* court concluded that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. [Citations.] Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant are deliberately spread before the jury in a joint trial. . . ." (*Id.,* at pp. 135-136 [20 L.Ed.2d at p. 485].) Later, the court held that there is no constitutional violation by admission of the out-of-court statement if the declarant codefendant testifies in his own defense, denies making the statement, and testifies favorably to the defendant. (*Nelson* v. *O'Neil* (1971) 402 U.S. 622, 629 [29 L.Ed.2d 222, 228, 91 S.Ct. 1723, 1727].)

The essential holding of *Bruton* was summarized and restated in a recent decision of the high court: " . . . a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." (*Richardson* v. *Marsh* (1987) 481 U.S. 200, 207 [95 L.Ed.2d 176, 186, 107 S.Ct. 1702, 1704].)

A common solution to the problem addressed in the *Aranda* and *Bruton* cases is to modify the confession so that all statements that identify the nondeclarant defendant are removed and replaced with neutral language.

That process of redaction was suggested in the *Aranda* case itself (see 63 Cal.2d at p. 530, fn. 10), and it has been followed with approval in California cases (see, e.g., *People* v. *Manson* (1976) 61 Cal.App.3d 102, 150 [132 Cal.Rptr. 265]), as well as in federal practice (*Richardson* v. *Marsh, supra.* It was followed in this case insofar as references to Jacobs by name are concerned. ■ Jacobs contends that the redaction did not go far enough, because the statements admitted included material that was usable against him. He also argues that the court erred in failing to instruct the jury to consider the statements only against Owen.

The respondent argues that we should not reach those issues, because Jacobs has failed to preserve them as bases for appellate error. We first consider that issue.

### B. *Cognizability*

#### 1. *Failure to Object*

■ Respondent acknowledges that Jacobs objected to introduction of Owen's statements on "*Aranda*" grounds, but argues that counsel's failure to specify the *Bruton* case as a basis for objection precludes review of *Bruton* error in this appeal.

There is no merit to this argument. Jacobs's attorney based his objection on "*Aranda,*" but in doing so he obviously was advancing a concept: that the confession of a codefendant declarant is not admissible against the nondeclarant defendant at their joint trial unless the restrictions of case law are followed. That concept is widely described as the "*Aranda-Bruton* rule" (see, e.g., Witkin, *supra*, § 293A, p. 375; *People* v. *Manson, supra,* 61 Cal.App.3d at p. 150; *People* v. *Epps* (1973) 34 Cal.App.3d 146, 157 [109 Cal.Rptr. 733]; *People* v. *Fulks* (1980) 110 Cal.App.3d 609, 616 [168 Cal.Rptr. 203]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1118 [240 Cal.Rptr. 585, 742 P.2d 1306]("*Bruton-Aranda* Error")), and an objection on the grounds of "*Aranda*" sufficiently informs the trial court and the prosecutor that the *Aranda-Bruton* rule is being invoked.

#### 2. *Abrogation of Aranda*

■ Respondent points out that the *Aranda* rule was announced as a judicial rule of criminal practice, rather than as a constitutional interpretation, and hence that it was abrogated by the adoption of Proposition 8 in 1982. The reference is to section 28, subdivision (d) of article I of the California Constitution (the Truth-in-Evidence provision), adopted as a

part of that initiative measure. It provides that all relevant evidence is admissible in criminal cases, within certain specific exceptions.

This argument, too, lacks merit. Even though *Aranda* was not announced as a constitutional doctrine, the rule that it states has been recognized as constitutionally based since *Bruton*. (See *People* v. *Anderson, supra,* 43 Cal.3d at p. 1121; *People* v. *Floyd* (1970) 1 Cal.3d 694, 719 [83 Cal.Rptr. 608, 464 P.2d 64].) Since the United States Supreme Court placed its *Bruton* holding on Sixth Amendment grounds, it obviously cannot be abrogated by state law. (See *In re Lance W.* (1985) 37 Cal.3d 873, 890 [210 Cal.Rptr. 631, 694 P.2d 744].)

### 3. *Failure to Request Limiting Instruction*

 Respondent argues that Jacobs failed to seek an instruction informing the jury that it may only consider Owen's out-of-court statements against declarant.

The record demonstrates that Jacobs's counsel objected to the joint trial, citing prejudice from the anticipated use of Owen's out-of-court statement. The request for severance was overruled. The issue was next confronted after the trial judge heard the testimony of one of the cellmates. The trial judge asked Jacobs's attorney if he wanted the jury to be admonished that it could only consider the statement against Owen. The prosecutor objected to this limitation. The trial judge replied that he did understand the basis of the objection, but would hear more argument. However, the issue was not raised again, and a limiting instruction was not given either at the time of the cellmates' testimony or in the formal instructions at the end of the trial.

Jacobs's appellate counsel argues that a sufficient objection and request for a limiting instruction was made at the trial court. Should we disagree, he urges a familiar alternative: that trial counsel's failure deprived Jacobs of effective assistance of counsel, requiring reversal under the rule of *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].

Evidence Code section 355 requires a trial court to "restrict the evidence to its proper scope and instruct the jury accordingly" whenever evidence is admissible as to one party and not another, *and* a request is made that it do so.

 The usual rule is that when a trial court fails to rule on an objection, the objecting party must do something to precipitate an actual ruling, or be deemed to have waived or abandoned the issue. (See *People* v. *Obie*

(1974) 41 Cal.App.3d 744, 750 [116 Cal.Rptr. 283], disapproved on other grounds in *People* v. *Rollo* (1977) 20 Cal.3d 109, 120 [141 Cal.Rptr. 177, 569 P.2d 771].) But where the court reserves its ruling, a failure to renew the point has been held not to bar its consideration on appeal; instead, "the court's failure to rule formally, after having reserved the ruling, constitute[s] an implied ruling against the objection and in favor of admissibility." (*People* v. *Flores* (1979) 92 Cal.App.3d 461, 466 [154 Cal.Rptr. 851].)

▋ As we view the record, a request for a limiting instruction was made—indeed, the trial court invited it—but the matter was left hanging and was never expressly resolved. The trial court did not reserve or submit the issue; it stated that it would hear further argument, and never did. Jacobs's counsel had an obligation to press the matter to a resolution. The record offers no clue why he did not do so. In light of the *Aranda-Bruton* line of cases, there was no sound reason to reject a request for a limiting instruction had one been made. ▋ It remains to consider whether the failure to press the issue deprived Jacobs of adequate representation. If the redacted confessions could not have harmed Jacobs, the failure of the trial court to limit them to Owen could not have adversely affected the outcome of the case against Jacobs. In the final portion of our consideration of Jacobs's appeal, we conclude that the failure to fully redact Owen's confessions was harmless as to Jacobs. For the same reason, it follows that Jacobs was not deprived of effective assistance of counsel by his attorney's failure to press for such an instruction.

▋ Having decided that Jacobs's appellate argument of *Aranda-Bruton* error is cognizable on appeal, we proceed to a consideration of its merits.

### C. *Merits of Aranda-Bruton Issue*

We have noted that respondent does not argue that there was no *Aranda-Bruton* error; the argument advanced is that none is cognizable on appeal or, if it is, that the error is harmless. The omission is understandable; there was error in the redaction.

Owen's confessions were redacted to delete all identifying references to Jacobs. But the editing out of statements of identification is not always enough, and was not sufficient in this case. The *Aranda* court was emphatic that "[b]y effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established." (*People* v. *Aranda, supra,* 63 Cal.2d at p. 530, fn. omitted.)

Jacobs points to two such statements that survived the redaction process.

### 1. *Jacobs Seen by Debois*

Owen's cellmate, Sires, testified that Owen had said that the "other guy" had been seen by a man on the night of the homicide. Considered in the context of the other evidence, this amounts to a statement that Debois was able to see Jacobs ("the other guy"). That corroborated Debois's identification evidence, a contested issue at trial. ▮▮▮ Jacobs specifically objected to this portion of the statement at an *in limine* motion before the evidence was presented. The trial court agreed that it should be edited out. Nevertheless, the statement was heard by the jury. While Jacobs did not renew his objection when the evidence was presented, his failure to do so in these circumstances did not constitute a waiver. (See *People* v. *Smith* (1970) 4 Cal.App.3d 41, 50 [84 Cal.Rptr. 229] [counsel's silence when evidence presented to jury, after having previously objected, was not a waiver].)

### 2. *Jacobs's Role*

▮▮▮ Owen's statements, as recounted by both cellmates, had Jacobs acting as the initiating party. It was he, according to these statements, who asked Owen to join him in intimidating Lise Singrin. Jacobs was on trial for second degree murder on an aiding and abetting theory. Given that context, his role as the instigator of the armed assault was relevant to the knowledge element of aiding and abetting. (See *People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392].)

Each of these passages includes a statement that "could be employed against" Jacobs, the nondeclarant defendant. It follows that they should have been redacted from the evidence presented to the jury, and that failure to do so was error. In turn, the issue becomes whether the error was harmless.

### D. *Harmless Error*

Both Jacobs and respondent argue that *Bruton* error is tested by the standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065], and we agree. (*People* v. *Anderson, supra,* 43 Cal.3d at p. 1128.) Under that standard, reversal is required unless we can say that the error was harmless beyond a reasonable doubt.

Whatever other failings they may have had, the redacted statements in this case did omit anything that identified Jacobs as "the other guy." The jury had to decide the critical issue of identity on the basis of other evidence. There was an abundance of evidence available.

First, and most important, was the identification by Mrs. Singrin. While her visual identification of Jacobs was limited, her recognition of his voice was quite positive, and its credibility was enhanced by her professional work in voice instruction. She had concentrated on that area for a dozen years, and her skill was demonstrated in the courtroom. Her identification was also aided by her recognition of the "feel" of Jacobs during the court-room reenactment. Finally, she was able to observe that her assailant had dark hair, a beard, a light face and dark eyes. All of these features fit Jacobs at the time; all but one still did at the time of trial. The exception was the beard, which Jacobs had eliminated.

Jacobs also was seen leaving the scene of the crime by Mr. Debois, who was able to get a fairly close look at him when Jacobs was illuminated by the headlights of Debois's car. Mr. Debois aided a police artist, who pre-pared a sketch. A year later, he identified Jacobs's picture in a photo line-up. He was unable to make a positive identification of Jacobs in court, but, as we have noted, Jacobs had changed his appearance by then, by shaving off his prominent beard. In the meantime, the police sketch was identified by Jeri Wyckoff, who knew him, as being that of Jacobs.

There was substantial evidence that Jacobs was acquainted with Lise Singrin. They had been seen together at various bars, and at the Sexton home. The fact that Jacobs and Ms. Singrin were acquainted, by itself, is of minor importance. It becomes significant when considered with the next piece of evidence bearing on identification: Jacobs's own testimony. He testified that he had not known Lise Singrin, and denied having been with her anywhere. These claims were thoroughly impeached by the testimony of Lynn Kile, Herbert Holmes, and Ruby Holmes. The jury was entitled to disbelieve Jacobs's denial of ever having known or been with Ms. Singrin. (See *People* v. *Kennedy* (1937) 21 Cal.App.2d 185, 201 [69 P.2d 224]; the principle is summarized in a standard jury instruction, CALJIC No. 2.21, which was included in the instructions given to the jury in this case.) Based on that, and other evidence, the jury was entitled to disbelieve Jacobs's alibi testimony that he was visiting his mother at the time of the homicide.

Finally, the alibi itself was refuted by independent evidence. The lady who was with Jacobs's mother at the time of Jacobs's visit recorded the visit as having occurred the day before the murder. And Jacobs's denial of receiving telephone calls from Owen during the visit was rebutted by tele-phone records of calls from Owen to the place his mother was staying during the visit.

It is true that Debois's identification testimony was supported by Owen's statement to one of his cellmates that a man saw "the other guy" as they

were leaving the Singrin residence. But this was a minor corroboration of strong, independent evidence. In light of the overwhelming evidence identifying Jacobs as "the other guy" at the scene, we are satisfied beyond a reasonable doubt that a deletion of Owen's conclusion that someone had seen "the other guy" would not have changed the outcome of the trial.

We conclude that Jacobs was proven to be the other person at the Singrin residence by evidence independent of Owen's out-of-court statements. However, we must address whether he was prejudiced by the portion of those statements that implied that he was the instigator of the attack.

At this point, we must assume that the jury fully credited Mrs. Singrin's testimony. She related Jacobs's command to her to be quiet, and his statement that "*we* aren't going to hurt her." To whom was he referring, if not Lise? And who was the other person implied by the plural "we," if not Owen? The final words Mrs. Singrin heard Jacobs speak before leaving, have a similar import: "Lets get out of here." They were spoken in the same calm voice that Jacobs had used before. They obviously were directed at Owen.

With this evidence and nothing more, it would strain credulity to conclude that Jacobs and Owen were not acting in concert. There was more, of course. The evidence established that Jacobs and Owen had entered the Singrin residence with a loaded shotgun, and that they fled the residence. Further evidence inferring Jacobs's guilt is found in his response to Ms. Wyckoff when she asked him if he had killed Ms. Singrin, and in his otherwise discredited testimony.

If that much was believed, as it had to have been quite independent of the testimony of Hamilton or Sires, there is overwhelming evidence that Jacobs knew that Owen intended a criminal act and that he encouraged or facilitated its commission. So long as the crime actually committed was reasonably foreseeable, Jacobs is guilty as an aider and abettor of that crime. (*People* v. *Croy, supra,* 41 Cal.3d at p. 12, fn. 5.)

 Beating a person with a loaded shotgun involves a foreseeably high risk that the victim will be killed by the gun's discharge, especially if there is an attempt to rescue the victim. It is sufficient for second degree murder. (See *Brooks* v. *Superior Court* (1966) 239 Cal.App.2d 538, 541 [48 Cal.Rptr. 762].)

The evidence also supported the possibility of a voluntary manslaughter alternative, about which the jury was also instructed. But given Owen's conduct and Jacobs's obvious awareness of it when he tried to prevent Mrs.

Singrin from interfering, voluntary manslaughter seems a remote possibility in this case.

■ In *People* v. *Anderson, supra,* 43 Cal.3d at p. 1129, the court concluded that a *Bruton*-violative statement was harmless even though it expressly identified defendant as the instigator of the crimes charged. The court reviewed earlier cases on *Bruton* error, and concluded that the error will be deemed harmless "if the properly admitted evidence is overwhelming, and the incriminating extrajudicial statement is merely cumulative of the other direct evidence." We do not understand this passage as a comprehensive statement of the only circumstance in which *Bruton* error may be harmless. In any event, the evidence of Jacobs's guilt was overwhelming on the basis of evidence quite independent of Owen's out-of-court statements, and the only portions of those statements that implicated defendant are cumulative to other evidence, and are insignificant in light of the other evidence in the case.

We are satisfied beyond a reasonable doubt that, even had a proper redaction occurred in this case, and even if an instruction had been given limiting consideration of the statement to the case against Owen, the outcome for Jacobs would have been no better than it was. The error is therefore not reversible.

## II. *Owen's Appeal*

### A. *Insufficiency of Evidence*

■ Owen argues that the evidence was insufficient to convict him of second degree murder. To the contrary, the evidence of his guilt was overwhelming.

Owen's argument is based in what he claims are weaknesses in identification testimony. But he was positively identified by Mrs. Singrin, who had an unobstructed view of him as he was beating her daughter and, later, as he was beating her. He also confessed to the crime. There was nothing inherently unsubstantial or unbelievable about this evidence. It constitutes substantial evidence, sufficient to support a guilty verdict for the crimes charged and found against Owen.

The argument is made that Mrs. Singrin was too emotionally involved at the time to be able to make a clear identification, and that the cellmates' testimony should be distrusted because of their unreliability and motivation to fabricate. The short answer to these arguments is that they are matters

for the trier of fact to evaluate. The trier did so and rejected them. We see no basis to overturn its decision.

B. *The Courtroom Demonstration*

■ Owen argues that the trial court should have precluded the courtroom demonstration in which Jacobs reenacted the act of grabbing Mrs. Singrin. He does not claim that the demonstration was improper because of a failure to faithfully depict what Mrs. Singrin related. Instead, he urges that it was unduly prejudicial and should have been excluded pursuant to Evidence Code section 352.

■ That provision reposes considerable discretion in the judgment of trial judges; their determinations will not be disturbed unless a clear abuse of discretion is shown. (See *People* v. *De La Plane* (1979) 88 Cal.App.3d 223, 247 [151 Cal.Rptr. 843] ("[t]he very essence of Evidence Code section 352 is to confer upon the trial court a broad discretion.") ■ This principle applies to courtroom demonstrations as well as to other kinds of evidence. (See *People* v. *McDaniel* (1976) 16 Cal.3d 156, 174-175 [127 Cal.Rptr. 467, 545 P.2d 843].) ■ The demonstration was important to a full understanding of Mrs. Singrin's testimony, and to her identification of Jacobs. No abuse of discretion is shown in the exercise of discretion in this case.

■ Owen's argument fails for another, and more fundamental, reason: it was Jacobs and not he that objected to the reenactment. "On appeal, a defendant cannot take advantage of objections made by a codefendant in the absence of stipulation or understanding to that effect." (*People* v. *Brown* (1980) 110 Cal.App.3d 24, 35 [167 Cal.Rptr. 557].) Owen's failure to personally object waived any claim of error that he might be heard to make. (See Evid. Code, § 353; *People* v. *Crume* (1976) 61 Cal.App.3d 803, 810 [132 Cal.Rptr. 577].)

C. *Prosecutorial Misconduct*

Owen presents four instances of what he claims to be acts of prosecutorial misconduct. No objection was made to any of them at trial.

■ "Prosecutorial misconduct implies the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*People* v. *Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672], quoted with approval in *People* v. *Haskett* (1982) 30 Cal.3d 841, 866 [180 Cal.Rptr. 640, 640 P.2d 776].) ■ Moreover, "the initial question to be decided in all cases in which a defendant complains of

prosecutorial misconduct for the first time on appeal is whether a timely objection and admonition would have cured the harm. If it would, the contention must be rejected [citation]; if it would not, the court must then and only then reach the issue whether on the whole record the harm resulted in a miscarriage of justice within the meaning of the Constitution." (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].)

We examine the specific instances that are raised with these principles in mind.

### 1. *Cross-examination of Jacobs*

During his cross-examination, Jacobs was asked about a trip he had made from northern California, during which his car broke down. He had paid all but $22.79 of the $382.79 repair bill, and had promised to pay the balance. It was still unpaid at trial. Jacobs said that he planned to take care of it; "in fact, I will go up and say Hi to them."

The prosecutor then asked whether that did not assume something; "[i]t assumes that you will be in a position to do that, doesn't it?"

The question was sarcastic, but not an improper rejoinder to Jacobs's implication that he would be acquitted and therefore able to travel. In any event, the exchange was minor and of no moment in the context of the full examination. It surely does not rise (or sink) to the level of conduct condemned by the misconduct cases.

### 2. *Redirect Examination of a Cellmate*

As we have seen, each of the cellmate witnesses was impeached, and each had a great deal to be impeached about. The next instance of claimed misconduct occurred during the prosecutor's attempt to rehabilitate Hamilton, one of these witnesses. It had been established that Hamilton had pleaded not guilty to a charged offense, had gone to trial, and had been convicted. The prosecutor then asked:

"Q: I guess you would be the first person to admit that whether a person is arrested or not doesn't necessarily have any bearing on that person's guilt or innocence. Is that right?

"A: That's correct.

"Q: Even if they go to trial and say they are not guilty, it is not necessarily a reflection of how that person feels about his guilt or innocence?

"A: That's very true."

Owen argues that the prosecutor was trying to imply that Owen had pleaded not guilty even though he knew that he was guilty. The inference that this is the prosecutor's intent is at least speculative. His obvious purpose was to try to rehabilitate an impeached prosecution witness. We can see no harm to Owen resulting from the questions and statements, and it is difficult to frame just what objection Owen's counsel might have made. But if, somehow, there is a sinister implication in the colloquy, it certainly is of the curable variety. Hence, the failure to promptly object waived a claim of cognizable error on appeal.

### 3. *Closing Argument*

 In his closing argument, the prosecutor made the following remark about the case against Owen: "It really comes down to, in the final analysis in this case, if Tom Owen was on an oil rig at the time, he is not guilty. . . . He is innocent. Reasonable doubt has nothing to do with it. And, on the other hand, if he was in that house, he's guilty of the charge of murder and Count II."

Owen argues that this amounted to an invitation to the jury that it disregard the rule that it may convict only upon proof beyond a reasonable doubt. It amounted to nothing of the sort. The prosecutor was simply pointing out that if the jury believed Owen's alibi—that he was working on an oil island when the crimes were committed—he is innocent of all charges; and no further inquiry need be made. The reference to reasonable doubt was unfortunate and should not have been made. But the statement was hardly misconduct. If there was any danger that the jury might take this statement as an invitation to jettison the reasonable doubt rule, about which so much was made in argument, a timely objection and request for admonition would have cured the matter. None was made. The jury was fully instructed on reasonable doubt, and there is no reason to suppose that it disregarded those instructions.

### 4. *Argument at Sentencing*

 Owen did not testify. However, he apparently did make a number of self-serving statements to the probation officer, which found their way into a portion of the probation report. At the sentencing hearing, the prosecutor made the following comment about that passage: "And the defendant [appellant Owen], he has never of course, taken the witness stand and denied responsibility, but he has—and this is a quirk that we have in our law—but he can, through a probation officer, disavow innocence, he can tell

these people. . . . All he is telling the court is how good he has been the last two years, but he doesn't say, but the reason I am now good and the reason I got off the drug track is because I was involved in that killing. In fact, his failure to say that to the court is indicative that he is in fact aware of his responsibility of it."

The gist of the prosecutor's comment appears to be that Owen was not candid in his statement to the probation officer. The prosecutor also lamented the fact that Owen was able to present his statements through the medium of the probation officer's report, even though he had not testified.

It would have been better if the prosecutor had made no reference to the fact that Owen did not testify. The comment that he did make would have been serious had it been made to the jury. But it was not; it was made to the trial judge who, obviously, was well aware that neither Owen nor any defendant may be penalized in any way for exercising a constitutional privilege not to testify. It is inconceivable that any prejudice resulted from the reference.

We conclude that there was no prosecutorial misconduct and that, even if there were, any possible prejudice could have been averted by a timely objection and request for admonition. Consequently, this area of argument affords no basis for relief to Owen.

### DISPOSITION

The judgments of conviction are affirmed.

Hastings, Acting P. J., and Boren, J., concurred.

A petition for a rehearing was denied December 3, 1987, and the petition of appellant Jacobs for review by the Supreme Court was denied February 24, 1988.

PAGES 1438-1628:

[1] Review granted and the cause was transferred to the Court of Appeal, Fourth Appellate District, Division One, with directions. Subsequent opinion was not certified for publication.

[2] Deleted on direction of Supreme Court by order dated February 18, 1988.

[3] Deleted on direction of Supreme Court by order dated May 19, 1988.

[4] Deleted on direction of Supreme Court by order dated January 21, 1988.

[5] Review granted. See 46 Cal.3d 902 for Supreme Court opinion.

[6] Review granted. On April 1, 1988, cause transferred to the Court of Appeal, First Appellate District, Division Five, with directions. See 201 Cal.App.3d 726 for subsequent opinion.

[7] Review granted. On July 28, 1988, cause transferred to the Court of Appeal, First Appellate District, Division Three, with directions. Subsequent opinion was not certified for publication.

[8] Review granted. Reprinted without change in 208 Cal.App.3d 522, to permit tracking pending review by the Supreme Court.

[9] Review granted. See 44 Cal.3d 799 for Supreme Court opinion.

[10] Review granted. Review dismissed and cause remanded to the Court of Appeal, Fifth Appellate District on August 25, 1988.

[11] Review granted. Reprinted without change in 208 Cal.App.3d 538, to permit tracking pending review by the Supreme Court.

[12] Review granted. See 46 Cal.3d 585 for Supreme Court opinion.

[13] Review granted. Reprinted without change in 208 Cal.App.3d 555, to permit tracking pending review by the Supreme Court.

[14] Review granted. On December 8, 1988, cause transferred to the Court of Appeal, Second Appellate District, Division Four, with directions. See 207 Cal.App.3d 964 for subsequent opinion.

[15] Review granted. Reprinted without change in 208 Cal.App.3d 543, to permit tracking pending review by the Supreme Court.

[16] Deleted on direction of Supreme Court by order dated March 24, 1988.

[17] Rehearing granted. See 197 Cal.App.3d 1275 for subsequent opinion.