[No. B050317. Second Dist., Div. Three. Dec. 14, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
JUAN JOSE OROZCO et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 1b through 5 of the Discussion.

## COUNSEL

Christopher Blake and Paul M. Posner, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey and Kenneth C. Byrne, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## HAHN, J.*—

### PROCEDURAL HISTORY

By information appellants Enrique Sanchez Valenzuela and Juan Jose Orozco were charged with one count of murder (count 1), a violation of Penal Code section 187, subdivision (a);[1] two counts (counts 2 and 3) of attempted willful, deliberate and premeditated murder, violations of sections 664 and 187, subdivision (a); and two counts (counts 4 and 5) of assault with a firearm, violations of section 245, subdivision (a)(2). Appellant Valenzuela was also charged with two counts (counts 6 and 7) of possession for sale of a controlled substance, heroin and cocaine respectively, violations of Health and Safety Code section 11351. In counts 1 through 5 appellant Orozco was alleged to have personally used a firearm in the commission of those

---

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.

[1]All further references to code sections will be to the Penal Code unless otherwise specified.

offenses within the meaning of sections 1203.06, subdivision (a)(1) and 12022.5. It was also alleged in those same five counts that in the commission of those offenses a principal was armed with a firearm within the meaning of section 12022, subdivision (a).

Both appellants entered not guilty pleas, and denied all special allegations. Prior to trial, on motion of the People, count 7 was stricken from the information. Appellants' motions to sever their cases for trial were denied.

Trial was by jury. After the start of the presentation of evidence, on motion of the People, count 7 was reinstated as to appellant Valenzuela. Following the presentation of all evidence, on motion of the People, counts 2 and 3 were dismissed.

Appellant Valenzuela was found guilty as charged in counts 1 and 4 through 7. Appellant Orozco was found guilty as charged in counts 1, 4, and 5. The jury found the murder charged in count 1 to be of the first degree, and found all special allegations true as to both appellants.

Probation was denied appellant Valenzuela. Appellant Valenzuela was sentenced to state prison for a total determinate term of five years on counts 4 through 7 and a consecutive term prescribed by law of twenty-five years to life on count 1. Appellant received total credit for 888 days, including conduct credit.

Probation was denied appellant Orozco. Appellant Orozco was sentenced to state prison for a determinate term of six years on counts 4 and 5, and a consecutive term prescribed by law of twenty-five years to life on count 1. Appellant Orozco received credit for 883 days, including conduct credit.

Each appellant filed a timely notice of appeal.

FACTUAL HISTORY

1. *Evidence pertaining to counts 1, 4, and 5.*

In accordance with the usual rules of appellate review (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), the evidence at trial established that on July 17, 1988, about 3:10 a.m., Angel Ramos was beneath an underpass below a road which connected 3rd and Hope Streets in Los Angeles. Mr. Ramos was talking to a friend, Chino, while another man, Gotto, was sleeping nearby.

A van pulled up, inside of which were three people. Mr. Ramos could only identify one person, whom he knew as Pedro. Two of the men had rifles, and

began shooting. Pedro had a single-shot rifle while a second man had what sounded like a semiautomatic firearm. The shooting lasted for three or four minutes during which approximately fifty to sixty shots were fired from the semiautomatic weapon. Mr. Ramos tried to take cover by lying prone on the ground, but was shot in the back.

The van drove away, and Mr. Ramos crawled from where he was. Mr. Ramos then noticed that Gotto was bleeding, and was not moving. Mr. Ramos went to the hospital where a bullet was removed from his back. He stayed in the hospital for about a week.

Before the day of the shooting, on many occasions Mr. Ramos had seen appellant Valenzuela, known as Pizza, talking to Gotto. Mr. Ramos described appellant Valenzuela and Gotto as being "business associates" with respect to drug sales. On eight or nine occasions, Gotto sold heroin and cocaine received from appellant Valenzuela. Most of the time, Gotto gave the proceeds from the drug sales to appellant Valenzuela. However, Gotto sometimes took or "skimmed" some of the heroin for himself, which he was not supposed to do. About a week before the shooting, Mr. Ramos had seen appellant Valenzuela holding a rifle similar to the one used in the shooting.

Theresa Rivera was in the vicinity of 1st and Flower Streets when she heard gunshots. She ran to the railing of an overpass where she observed Angel Ramos running up the side of the bridge. She could tell that Mr. Ramos was injured because of the way he was dragging his leg. She then saw a gray van proceeding in her direction. The van pulled up to where she was standing. She saw there were three men inside, all of whom turned and looked at her. Ms. Rivera recognized appellant Orozco, whom she knew as Gordo, driving the van. She was not able to recognize the other two men because they were on the other side of the van where it was darker. She was able to tell that one man was in the passenger seat while the other was in the middle of the passenger and driver seats. The van turned left on 1st Street, and drove away.

Ms. Rivera had seen both appellants driving together in appellant Valenzuela's car on the day before the shooting. About 10 p.m. on the evening of the shooting, Ms. Rivera saw both appellants along with three other men she knew as Orilleo, Cessel, and Pedro, standing outside appellant Valenzuela's car in a parking lot on 3rd Street between Hill and Broadway. This was the same general area where Ms. Rivera had seen these people selling drugs. Ms. Rivera saw the same men together at that same location again about 2 a.m. on the morning of the shooting.

Jorge Zapada was with Theresa Rivera when he heard shots fired on the morning of July 17. Mr. Zapada went to the bridge where he recognized

appellant Orozco who was crossing in front of a van stopped on the overpass. Appellant Orozco got into the driver's seat. Mr. Zapada observed appellant Orozco place a gun into his waistband. One of the other men inside the van, appellant Orozco's brother, Orilleo, then pulled a rifle into the passenger's side of the van.

About an hour or two later, appellant Valenzuela, known to Mr. Zapada as Pizza, gave Mr. Zapada approximately 12 or more balloons filled with heroin, and instructed Mr. Zapada to sell them. There were other people who lived under the bridge, and sold heroin or cocaine for appellant Valenzuela.

Appellant Valenzuela told Mr. Zapada that if he used the heroin instead of selling it, he "would know the name of the game." Mr. Zapada knew that immediately before the shooting, Gotto had been selling heroin for appellant Valenzuela. He had seen appellant Valenzuela and other men display weapons in the presence of the homeless people who stayed under the overpass. On those occasions appellant Valenzuela would say that "that would be for those who owed him."

Diane Olivares was under the bridge when she heard the shooting the morning of July 17. Shortly after hearing the shots, Chino and Dora came running to her location. Chino had been shot in the right leg, by the ankle. Chino was mad. Chino said that Mr. Ramos had been shot in the shoulder, and that Gotto had been killed. Chino also told Ms. Olivares that he did not know what had happened, or why he got shot. He also told her the assailants were in a dark van, and were "shot crazy."

On July 17, 1988, at a little after 3 a.m., Los Angeles Police Sergeant Bill McDaniel responded to a radio call regarding a shooting. At a parking garage in the 200 block of Grand Avenue, Sergeant McDaniel discovered a man who had been shot in the back. An ambulance arrived, and the man was treated.

The parking lot attendant pointed towards the northeast, and Sergeant McDaniel drove north in an attempt to locate additional victims. Near the intersection of 3rd and Hope Streets, Sergeant McDaniel saw a fireman who told him there was an additional victim. Sergeant McDaniel then saw a man lying on an embankment by an overpass. The man was bleeding. As Sergeant McDaniel proceeded to try to help the man, firefighters arrived, and determined that the man was dead. Sergeant McDaniel observed a number of shell casings on the dirt embankment, and on a nearby street.

At 4:35 a.m. on July 17, Detective Albert Gonzales arrived at the scene where the decedent was. The decedent had no identification on his person,

but was later identified as Vincent Hernandez. Detective Gonzales recovered a number of shell casings at the scene of the shooting. Some were .30-caliber shell casings, consistent with ammunition used in AK-47's, while others appeared to have fired from a 9-millimeter weapon. This opinion with respect to these shell casings was also that of Officer Kempton Lockwood from the Firearms and Explosives Unit of the Los Angeles Police Department.

Later that morning, Detective Gonzales learned that a van had been stolen from the General Fed Development Corporation, and that it might have been used in the shooting. About 10 a.m. the van was impounded at 1657 West 3rd Street, approximately a mile or mile and a half from the murder scene. Recovered from inside the van were eleven .30-caliber shell casings, seven 9-millimeter shell casings, and one .38-caliber live round. The shell casings appeared to be the same type as those recovered at the scene of the shooting.

A day or two later, Detective Gonzales went to a motel at 1631 West 3rd Street in an attempt to find anyone in the motel who might have seen someone driving the van. One of the men Detective Gonzales spoke to was appellant Valenzuela. Napoleon Madina, the desk clerk at the Holiday Lodge Motel at 1631 West 3rd Street, indicated that appellant Valenzuela checked into room 128 on June 18, 1988, and checked out July 18, 1988.

After appellant Valenzuela's arrest, Detective Gonzales interviewed appellant Valenzuela after advising him of his constitutional rights. Appellant Valenzuela said he was also called Pizza. He told Detective Gonzales that Gotto had worked for him selling "cliva," which was heroin. He said Gotto owed appellant Valenzuela "$100 worth of balloons," and that appellant Valenzuela had become "real mad" because Gotto had not paid. Appellant Valenzuela further said that Gotto owed money to a lot of people in the area.

Appellant Valenzuela said that he had ordered "two guys" to go out and kill Gotto. He said that even though he ordered Gotto killed, he himself had not done the killing. He said he had never been in "the van," and that police would be unable to find his fingerprints there. He denied knowing what type of gun had been used. He denied paying either man money to kill Gotto. Appellant Valenzuela said that if he were released, he would find out the names of the people he had told to kill Gotto.

On July 17, 1988, Dr. Russell had been on duty at the University of Southern California Medical Center Emergency Room when Luis Hernandez was there. Dr. Russell observed three gunshot wounds on Mr. Hernandez's right leg.

Dr. Lakshmanan Sathyavagiswaran from the Los Angeles County Medical Examiner's Office concluded that Vincent Hernandez died of multiple gunshot wounds. The victim sustained three gunshot wounds, all to the back and all being through-and-through wounds, any one of which would have been sufficient to cause death. The victim probably died within 20 to 30 seconds. The injuries were consistent with a high velocity firearm, like a rifle-type injury.

2. *Evidence pertaining to counts 6 and 7.*

On July 27, 1988, Officer Richard Duran stopped appellant Valenzuela who was in a vehicle near 5th and San Pedro Streets. Officer Duran arrested appellant for suspicion of murder. Officer Duran looked inside appellant Valenzuela's car, and saw balloons on the front seat which appeared to contain heroin. He also saw some paper bindles.

On February 17, 1989, Los Angeles Police Department Criminalist Debbie Daniels analyzed the items seized from appellant Valenzuela's car. There were five paper bindles which contained a white substance. She found the net weight of the contents from three balloons to be 2.02 grams of substance containing cocaine. From five of thirty-five balloons, Ms. Daniels removed a tan substance, and found its net weight to be 5.91 grams. The substance contained heroin.

Narcotics Detective Douglas Urschal found the packaging of the substances in the balloons to be "very common." He believed that both the balloons and the bindles along with the substances they contained, seized from appellant Valenzuela's car, were possessed for purpose of sale.

In defense, defense investigator Daniel Vasquez testified that he had interviewed Theresa Rivera. She told him that appellant Valenzuela had given street people "stuff," and that these people would sell it to others or use it themselves, thereby "burning" appellant Valenzuela. Appellant Valenzuela normally would become angry when this occurred. Ms. Rivera told investigator Vasquez that appellant Valenzuela had threatened to kill whoever "burned" him.

Ms. Rivera told investigator Vasquez that she had taken Thorazine before her interview with him. She also said she had ingested cocaine several hours before the July 17 shooting.

Detective Jose Reyes testified that he had questioned a man named Daniel Busario Gonzales. Mr. Gonzales had said that he killed Angel Ramos because Mr. Ramos had caused Mr. Gonzales "a lot of trouble."

According to Dr. Eugene Carpenter, after an autopsy of Angel Ramos performed on June 28, 1989, it was his conclusion that Mr. Ramos died as a result of multiple stab wounds to the chest, abdomen, right arm, and left hand.

## ISSUES RAISED ON APPEAL

Appellants each argue that: (1) their respective motions to sever the trial should have been granted; (2) the trial court improperly prevented impeachment of Teresa Rivera; (3) a mistrial should have been declared based upon a violation of discovery; (4) it was error to refuse to instruct the jury that testimony of a narcotics user should be viewed with caution; and (5) error occurred when jury deliberations were suspended for 11 days.

## DISCUSSION

1. *The motions to sever the trial.*

 a. *Appellant Orozco's motion.*

■ Appellant Orozco filed a motion to sever his trial from that of appellant Valenzuela based upon a statement made to police by appellant Valenzuela which the prosecution intended to use as evidence. The trial court determined, and the People agreed, that a sentence from the statement would be deleted wherein appellant Valenzuela said he told "Manuel," another name used by appellant Orozco, and another man he knew only by sight, to go out and kill Gotto. The trial court allowed the statement to remain in evidence that appellant Valenzuela told "two guys" to go out and kill Gotto. Appellant Orozco objected to this statement, arguing that the prosecution would try to show that he was one of the two guys.

During trial, appellant Valenzuela's statement as edited was introduced into evidence. In jury instructions, the jury was instructed as follows: "Evidence has been received of a statement made by a defendant after his arrest, specifically [defendant] Valenzuela Sanchez. [¶] At the time the evidence of this statement was received you were told that it could not be considered by you against the other defendant [Orozco]. [¶] Do not consider the evidence of such statement against the other defendant, in any manner."

Appellant Orozco now argues that the introduction of the statement resulted in prejudice to him, and that he should have received a separate trial. He asserts that prejudice occurred with respect to his identification as a

participant in the shootings and as to the finding of first degree murder when compared with other evidence implicating him in the shootings.[2]

■ The essential holding of *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], is that a defendant is deprived of the Sixth Amendment right to confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the defendant who made it. (*Richardson* v. *Marsh* (1987) 481 U.S. 200, 207 [95 L.Ed.2d 176, 185-186, 107 S.Ct. 1702].) This interpretation of the Sixth Amendment corresponds to the holding in *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], and to the extent that *Aranda* corresponds with *Bruton*, it was not abrogated by Proposition 8 as embodied in section 28, subdivision (d) of article I of the California Constitution. (*People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1045 [5 Cal.Rptr.2d 230, 824 P.2d 1277], cert. den. (1992) [121 L.Ed.2d 263, 113 S.Ct. 349].)

In *Richardson*, the Supreme Court was called upon to discuss the applicability of *Bruton* to those situations wherein, whether as a process of redaction or not, a confession was not incriminating on its face, but became so only with evidence introduced later at trial. The court concluded that in such cases a jury is more likely to follow an instruction to disregard such a confession with respect to the nondeclarant defendant. (*Richardson* v. *Marsh*, *supra*, 481 U.S. 200.) The court noted the vital role played by joint trials in the criminal justice system in concluding that if the *Bruton* rule were applied to such confessions, the efficiency and fairness of the criminal justice system would be impaired because separate trials would be required in all cases in which incriminating statements existed. (*Id.* at p. 209 [95 L.Ed.2d at pp. 186-187].) Thus, it was concluded that the confrontation clause is not violated when a nontestifying codefendant's confession is admitted with a limiting instruction when the confession is admitted after being redacted to eliminate reference to the defendant. (*Id.* at p. 211 [95 L.Ed.2d at p. 188].) Significantly, for purposes of the instant case, the court pointed out that it was rendering no opinion with respect to the replacement of a name with a symbol or neutral pronoun. (*Id.* at p. 211, fn. 5 [95 L.Ed.2d at p. 188].)

Because the *Richardson* case is a further explanation of what is permissible under the Sixth Amendment, it applies to such evidentiary issues in this state. (*People* v. *Mitcham*, *supra*, 1 Cal.4th at p. 1045.) ■ The issue still remains, however, as to where the use of neutral pronouns fits into the analysis.

---

[2]Appellant Orozco acknowledges that if error occurred, as he asserts, he would accept a reduction in the offense to second degree murder in lieu of a new trial.

The courts of this state as well as federal courts have reached different conclusions when statements have been redacted to eliminate specific names, but have included neutral terms. In *People* v. *Jacobs* (1987) 195 Cal.App.3d 1636 [241 Cal.Rptr. 550], the Court of Appeal found error, although harmless, when a statement was redacted, but reference to "the other guy" was substituted. Although not using the analysis of *Richardson*, the *Jacobs* court concluded that the statement violated *Bruton* because under the circumstances "the other guy" could only have referred to the defendant. (*Id.* at pp. 1651-1652.) However, in *People* v. *Vasquez Diaz* (1991) 229 Cal.App.3d 1310 [280 Cal.Rptr. 599], the court found no error in the use of a statement redacted to include neutral terms. The statement involved had been redacted so that it referred to the codefendant and "another person," and in another portion it referred to "they" when discussing how the codefendant and the other person had left the store after taking the money. The court discussed what it perceived as a distinction from *Jacobs* in that there was nothing distinctive in the redacted statement which would implicate the defendant as being who was referred to as "another person." It was other witnesses and the time of the arrest that provided the incriminating information. Thus, the court found the statement to be within the permissible principles of *Richardson*. (229 Cal.App.3d at pp. 1315-1316.)

In *U.S.* v. *Bennett* (11th Cir. 1988) 848 F.2d 1134, the court analyzed a redacted statement wherein the words "they" and "them" were used in place of the codefendant's and defendant's names. Utilizing the principles of *Richardson* and *Bruton*, the court concluded that it was error, although harmless, to admit the statement because the use was so distinctive that in the context of the statement the word "they" could only have referred to the two defendants. The court also found no proper limiting instruction was given. (848 F.2d at pp. 1141-1142.)

However, in *U.S.* v. *Vasquez* (11th Cir. 1989) 874 F.2d 1515, the court concluded that the redacted statement admitted into evidence did not violate *Bruton*. In that statement, the defendant's name was eliminated, and instead at one point the word "friend" was used and in another place the word "individual" was used to refer to the codefendant's connection in the counterfeiting of money. The court found that the redacted statement did not compel a direct implication of the defendant because there was no evidence that the defendant was the only counterfeit money source. Thus, the admission of the statement as redacted was found to be consistent with *Richardson*. (874 F.2d at p. 1518.)

An analysis of such cases as those cited leads to a conclusion that with respect to the use of neutral terms as substitutes for specific names, there is

no hard and fast rule. Rather, the approach should be an analysis on a case-by-case basis of the term used within the context of the redacted statement. In those cases wherein the neutral term still obviously refers to the nondeclaring defendant, all references to the specific name or any identifying term must be eliminated to satisfy *Bruton*. However, where the use of a neutral term does not compel incriminating implication of the nondeclaring defendant, the statement may properly be used under the principles set forth in *Richardson* as long as the trial court provides a sufficient limiting instruction.

 In the instant case, the trial court eliminated the one statement specifically naming appellant Orozco. An analysis of the statement containing reference to appellant Valenzuela ordering "two guys" to kill Gotto does not incriminate appellant Orozco directly or indirectly within the context of the statement. First of all, the statement in its totality indicates that appellant Valenzuela was not at the killing and would need to find out the names of the people he had talked to. Secondly, as in the *Vasquez* case, there were a number of other people referred to in the evidence as having had some contact with appellant Valenzuela. In other words, the evidence other than the statement did not refer to only two other people with whom appellant Valenzuela had had contact such that the reference to "two guys" could only have referred to appellant Orozco.

The incriminating link in this case was provided by the eyewitness identification testimony in addition to the testimony of witnesses placing appellant Orozco in the company of appellant Valenzuela at or near the time of the crime. Furthermore, the trial court gave a very specific limiting instruction precluding any use of the statement against appellant Orozco. Thus, under the principles of *Richardson* v. *Marsh*, *supra*, 481 U.S. 200, the statement would not be used against appellant Orozco either with respect to his identification or as to the elements of the crime because he was not implicated in the statement.

 In any event, any error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) With respect to appellant Orozco's identification, there was ample eyewitness identification evidence in the form of testimony of Theresa Rivera and Jorge Zapada who, despite attacks on their credibility, both positively and independently identified appellant Orozco and described his actions.

With respect to the evidence supporting a finding of first degree murder, there was also more than substantial evidence apart from appellant Valenzuela's statement when guided by the principles of *People* v. *Thomas* (1992)

2 Cal.4th 489 [7 Cal.Rptr.2d 199, 828 P.2d 101]. In *Thomas*, the Supreme Court determined that the three categories of evidence test for analyzing premeditation and deliberation necessary for first degree murder, as articulated in *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], is to be used as a guide for reviewing courts, and not for "unreflective reliance."

In the instant case, there was clearly strong evidence of a preconceived design based upon the manner of the killing. The random firing of upwards of 50 to 60 shots from an AK-47 at an unarmed and sleeping target suggests the intention was only to ensure death. As described by Chino to witness Diane Olivares, the people in the van "shot crazy."

Moreover, the evidence with respect to the gathering of people before the shooting, the placing of weapons back into the van after the shooting, and the use of a stolen van as the means to carry out the shooting certainly is suggestive of planning activity in order to carry out the killing.

While the evidence of motive might be characterized as thin, besides the statement of appellant Valenzuela, the testimony of Angel Ramos and Jorge Zapada established that Gotto had sold narcotics for appellant Valenzuela, and that on occasion Gotto "skimmed" for himself. Appellant Orozco's presence with appellant Valenzuela immediately before the crime could have allowed an inference that appellant Orozco understood why the crime was being committed.

█ Nevertheless, motive is not required. " 'A senseless, random, but premeditated, killing supports a verdict of first degree murder.' " (*People* v. *Thomas, supra*, 2 Cal.4th at p. 519.) █ The evidence of the manner of the shooting coupled with evidence supporting the planning activity as well as what happened after the shooting was more than ample to support a first degree murder finding, and render any error in connection with appellant Valenzuela's statement harmless.

1.b.-5.*

. . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1554.

## DISPOSITION

The judgments are affirmed.

Klein, P. J., and Croskey, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 16, 1994.