Filed 12/16/15  P. v. Toscano CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>EVARISTO TOSCANO,<br><br>        Defendant and Appellant. | A137606<br><br>(Alameda County<br>Super. Ct. No. 166269) |

Defendant Evaristo Toscano was convicted of second degree murder after he shot and killed a man in retaliation for a fight over graffiti tagging.  He argues that his conviction must be reversed because (1) material evidence was not preserved, (2) a hearsay statement identifying him as the shooter was improperly admitted into evidence; (3) a pretrial statement he made implicating his codefendant was improperly redacted and he was wrongly tried with his codefendant, and (4) the trial court improperly questioned and commented on the testimony of a memory expert.  We conclude that the admission of the hearsay statement, while mistaken, did not amount to reversible error.  And because we reject the remaining arguments, we affirm.

# I.
## FACTUAL AND PROCEDURAL
## BACKGROUND

On the night of June 11, 2010, four young male relatives—Adham, Awad, Samey, and Samier[1]—were working at an older relative's discount store on International Boulevard in East Oakland.  As they were cleaning the store after it closed at 10:00 p.m., Samey and Adham walked outside and saw two male teenagers (about three or four years apart) spray painting graffiti on a white truck in the parking lot.  Adham slammed the gate of the parking lot to get the teenagers' attention, at which point the older teenager (who Adham recognized from the neighborhood) sprayed Adham on the arm.  Adham retaliated by hitting the older teenager in the face, knocking him to the ground.  Adham then grabbed the teenager's bottle of spray paint and sprayed one or both teenagers.  Samey told the two teenagers to leave, and they did.  Awad stayed outside, and at some point the older teenager returned to the area and asked for the phone he had left behind; Samey threw it across the street so that the teenager had to retrieve it.  The teenager left again, and the four relatives continued to clean the store.

The four finished cleaning, locked the store, and were ready to leave.  Before they left, they saw four men walking toward them.  One of the men (a "chubby guy" later identified as Hector Vilchis, who was dating the younger graffiti tagger's cousin) kicked the white van in the parking lot.  Adham saw a tall and thin Hispanic man (later identified as Toscano, who was dating the younger tagger's sister) lift a gun, and Adham and Samey ran while Awad "ducked down."  Samier tried to talk with Toscano, but Toscano fired several shots, hitting Samier.  Samier died at the scene from a gunshot wound to his chest.

Police separately interviewed Adham, Awad, and Samey in the early morning hours after the murder, and, although they were upset and distracted, the three provided

---

[1] Awad, Samey, and Samier were brothers, and Adham was their cousin.  The four share the last name Ayesh.  In the interest of clarity, we use their first names when referring to them individually.

separate accounts of what had happened. The three returned to the police department two months later, on August 6, 2010, and falsely reported that it was the graffiti tagger who Adham had hit who had returned to the store and had shot Samier. As they acknowledged at trial, the Ayeshes coordinated making the false report because they wanted someone who was involved that night to pay in some way for Samier's murder. The interviews were recorded on DVDs, but the investigator who conducted the interviews, Sgt. Sean Fleming, later misplaced the DVDs. While they were at the police department in August, the three were shown a photographic lineup, and they all falsely identified the graffiti tagger as having returned to the scene. Notwithstanding these identifications, Sgt. Fleming did not pursue the graffiti tagger as a suspect, but he did follow other investigative leads.

The three Ayesh witnesses spoke with police again in February 2011. Sgt. Fleming showed Adham, Awad, and Samey a photographic lineup that for the first time included Toscano (who had recently been identified as a possible suspect), and Adham alone identified Toscano as being involved in the crime.

Police arrested Toscano on February 24, 2011. Toscano and Vilchis were charged by information with one count of first degree murder and three counts of attempted murder, with various enhancements alleged. As discussed more fully below, Toscano admitted to police he was present at the scene when Samier was shot but denied firing a gun.

In March 2011, on the day Vilchis was arraigned, police showed the three Ayesh witnesses photographic lineups, and Adham alone identified Vilchis as having shot a gun and having kicked a vehicle before the shooting started. Sgt. Fleming used a total of four lineups, but he misfiled two of them (the one shown to Awad and the one shown to Samey) and could not locate them during pretrial discovery. No one was selected out of the two lineups that went missing even though they apparently included Vilchis.

3

A jury convicted Toscano of second degree murder (Pen. Code, § 187, subd. (a))[2] and found true allegations that he: (1) personally and intentionally discharged a firearm and caused great bodily injury or death (§§ 12022.7, subd. (a), 12022.53, subd. (d)), (2) personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c), and (3) personally used a firearm within the meaning of sections 12022.5, subdivision (a) and 12022.53, subdivision (b). The jury also convicted Toscano of three counts of attempted murder (§§ 187, subd. (a), 664), with true findings on allegations that he: (1) personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c), (2) personally used a firearm within the meaning of section 12022.53, subdivision (b), and (3) personally used a firearm within the meaning of section 12022.5, subdivision (a).[3]

The trial court sentenced Toscano to an indeterminate term of 40 years to life and a determinate term of 47 years, to be served consecutively.

II.
DISCUSSION

A. *The Failure to Preserve Recordings of Witness Interviews Did Not Violate Toscano's Right to Due Process.*

1. Additional background

As mentioned above, police recorded by video the August 2010 interviews in which Adham, Awad, and Samey falsely reported that one of the graffiti taggers played a role in the shooting. Police policy required that witness interviews be recorded and that two copies of the interviews be burned onto DVDs. Under the policy, a copy is to remain in the "evidence section," and a copy is to remain in the case file. Sgt. Fleming did not comply with this policy. He burned only one copy of each interview and placed the DVDs in his case file without making copies for the evidence section. During discovery, Sgt. Fleming could not locate the DVDs that he thought he had placed in the case files

---

[2] All statutory references are to the Penal Code unless otherwise specified.

[3] The trial court declared a mistrial as to Vilchis after jurors were unable to reach a verdict as to him.

4

and could not locate two of the photographic lineups used with the Ayeshes in March 2011. The defense attorneys were told in June 2011 that Sgt. Fleming was unable to locate the DVD recordings.

Toscano filed a motion to dismiss the information or to exclude any in-court identification of him, based on the police failure to preserve evidence. The trial court denied the motion, concluding that defendants had established no more than sloppiness or negligence, which did not rise to a constitutional violation justifying dismissal. The denial was without prejudice to raising the separate issue of possible sanctions for spoliation of evidence closer to trial, which Toscano did by filing an in limine motion.

During discussion of in limine motions, Vilchis's attorney reported she learned that Sgt. Fleming also had lost "a significant number" of witness interviews in another murder case and claimed that this was part of a pattern of disregarding police policies that should justify a finding of bad faith in the loss of evidence in this case.[4] The prosecutor acknowledged that it would be preferable to have the missing DVDs, and he expressed his understanding of defense counsel's frustration, but he argued the interviews were not as critical as they first appeared because the witnesses had admitted they had lied during them. Toscano's attorney disagreed, arguing that the missing evidence was critical in examining the false statements made by the percipient witnesses.

Sgt. Fleming testified outside the presence of the jury about the DVDs. He explained that around the time of his investigation in this case, he had been working on between 30 to 40 active homicide cases, and in the year of Samier's murder he had been one of six or seven investigators assigned to about 103 cases. Because there were so few homicide investigators, Fleming worked long hours and was sometimes required to work for more than 24 hours at a time. After he learned that the DVDs in this case were missing, Sgt. Fleming unsuccessfully tried to locate them by checking the original

---

[4] Toscano argues in a related petition for a writ of habeas corpus that his trial attorney was ineffective for failing to submit the reporter's transcript of the preliminary hearing. By separate order, we deny Toscano's habeas petition. (*In re Evaristo Toscano*, A143261.)

recording server and between 40 to 50 other case files, including some closed ones. He also looked for the two photographic lineups that were shown to Awad and Samey in March 2011 but could not find them either.

Sgt. Fleming acknowledged on cross-examination that it was the Oakland police department's policy for two copies of recorded interviews to be made, with one copy deposited into the evidence room. When asked why he neglected to make a second copy in this case, he testified, "It probably was due to time. I just probably had other things going on at that time. I have a high caseload, multiple cases I'm investigating at one time, and I just didn't make them at the proper time on that particular incident." Fleming also acknowledged that he failed to deposit the two missing photographic lineups into the property-and-evidence unit in accordance with department policy but said it had been standard practice to place everything in the "case file package" despite the policy.

The record is not entirely clear about what specific sanctions defendants sought. In his in limine motion, Toscano requested the court to exclude any evidence that Adham, Awad, or Samey ever identified him and to prohibit them from making an in-court identification. At the hearing on the motion, Toscano's counsel stated that he wanted to be able to talk about the Ayeshes' failure to identify anyone in the two missing lineups. Vilchis's counsel argued, "I think the appropriate sanction in this case . . . would be some form of suppression of identification evidence at the time of trial of the Ayeshes' identification of the defendants."

The trial court declined to impose sanctions. It found the police conducted "very sloppy work probably due to workload" and that Sgt. Fleming failed to follow proper protocol, but it found that this conduct "certainly was not intentional." At trial, Sgt. Fleming admitted in his testimony that the DVDs of the interviews conducted in August 2010 were missing.

6

## 2. Analysis

Toscano argues that the loss of the DVDs violated his right to due process.[5] We do not agree. The Due Process Clause of the Fourteenth Amendment requires defendants to have access to exculpatory evidence to protect the innocent from erroneous convictions and to ensure the integrity of the criminal-justice system. (*California v. Trombetta* (1984) 467 U.S. 479, 485.) Broadly speaking, this right involves two duties on the part of the prosecution: the duty to disclose exculpatory evidence (*ibid.*) and the duty to preserve it (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57). (See also *People v. Alvarez* (2014) 229 Cal.App.4th 761, 771.) With respect to the former duty, it is irrelevant whether the State acts in good or bad faith. (*Youngblood,* at p. 57.) There is no suggestion here that the prosecution failed to disclose evidence.

As for the duty to preserve evidence, it is limited to "evidence that might be expected to play a significant role in the suspect's defense," and to meet this standard, the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California v. Trombetta*, *supra*, 467 U.S. at pp. 488-489.) But the failure to preserve this type of evidence does not automatically constitute a denial of due process. A denial of due process requires the defendant to show that " 'potentially useful' " evidence was not preserved by the police in bad faith. (*Illinois v. Fisher* (2004) 540 U.S. 544, 549; *Arizona v. Youngblood*, *supra*, 488 U.S. at p. 58.)

We question whether a constitutional duty to preserve the DVDs was implicated here since Toscano was able to obtain, and he did obtain, comparable evidence by other means. (*California v. Trombetta*, *supra*, 467 U.S. at pp. 488-489; *People v. Walker* (1988) 47 Cal.3d 605, 638 [no showing that opportunity to cross-examine officer who

---

[5] In arguing in this appeal that he was deprived of his right to due process, Toscano focuses exclusively on the DVDs, perhaps because the missing lineups were more relevant to Vilchis's defense. The motions below included the missing photographic lineups from March 2010. Our analysis would apply equally to them.

monitored interview was inadequate to protect defendant's rights where tape was later destroyed]; *People v. Sassounian* (1986) 182 Cal.App.3d 361, 395-396 [where defense able to present evidence comparable to missing material, question arises as to whether missing record meets test of constitutional materiality under *Trombetta*].)  The evidence that mattered to Toscano was the fact that the Ayeshes lied during the interviews, and this fact was obtained by comparable means when the Ayeshes admitted and were cross-examined about it.  In closing argument, Toscano's counsel was able to effectively use the fact by attacking the credibility of those who had testified against Toscano and questioning the sufficiency of the evidence.  He argued that "there comes a point in time where all of these things are just piling up and just makes you get to the point where you believe that this case should just go away because there's just too many things that have occurred of a negative tainted nature for there to be really any credibility there at all." While the DVDs might have been useful to evaluate the Ayeshes' demeanor and exact wording during their interviews, we cannot conclude that there was a constitutional duty to preserve them in light of Toscano's successful ability to obtain and introduce, through the Ayeshes' admissions, comparable evidence.

Even assuming, as the trial court apparently did, that there was a constitutional duty to preserve the DVDs, the police conduct here did not violate Toscano's rights to due process.  We first reject Toscano's argument that there was no need to determine whether the police acted in bad faith.  He claims there was no need to find bad faith because the missing CDs were "per se exculpatory."  True, there is a distinction between " 'material[ly] exculpatory' evidence," where no showing of bad faith is required, and " 'potentially useful' evidence," where a showing of bad faith is required.  (*Illinois v. Fisher*, *supra*, 540 U.S. at p. 549.)  But Toscano overstates the exculpatory nature of the missing DVDs.  Again, they were mainly relevant to the Ayeshes' credibility, an issue Toscano fully explored at trial.  While having recordings of the interviews might have been potentially useful to Toscano's defense, we are not convinced that, given the Ayeshes' admissions that they falsely identified Toscano during the interviews, the

DVDs were so materially exculpatory that they rendered a finding of bad faith unnecessary.

On the question of bad faith, we conclude that substantial evidence supports the trial court's finding that the police acted at most negligently. (*People v. Roybal* (1998) 19 Cal.4th 481, 510 [trial court's ruling on whether police acted with bad faith reviewed for substantial evidence]; *People v. Alvarez, supra*, 229 Cal.App.4th at p. 774 [same].) Toscano correctly notes that Sgt. Fleming failed to follow departmental policy when he made only one copy of each of the interviews. But we disagree with him that this failure showed "evident" bad faith, given the trial court's determination, after hearing Sgt. Fleming testify and having the opportunity to evaluate his credibility, that the "sloppy" work was likely due to workload demands and "certainly was not intentional."

Because we conclude Toscano was not deprived of his right to due process, we also reject his argument that the trial court abused its discretion in failing to impose sanctions.

### B. *The Erroneous Admission of an Out-of-court Statement Regarding Toscano Was Harmless Error.*

#### 1. Additional background

After interviewing the three Ayeshes, Sgt. Fleming learned the identity of the older teenager who had been spray painting in the parking lot on the night of Samier's murder. Sgt. Fleming interviewed this teenager on February 24, 2011. At trial, the prosecutor asked Fleming what he had learned from the older teenager during that interview, and Toscano objected on hearsay grounds. The trial court agreed that the question called for hearsay and asked the prosecutor if the information was being offered for the truth of the matter asserted. The prosecutor responded by saying the testimony would be offered to explain the officer's subsequent conduct. The court then instructed the jury that "the hearsay is not for the truth, but is to show you what this officer, the sergeant, did subsequently in his investigation."

Sgt. Fleming then testified that the teenager told him about a "text conversation" the teenager had with the other graffiti tagger. When the officer was asked about the

9

contents of the conversation, Toscano again objected on hearsay grounds, explaining the question called for "double hearsay." The trial court again overruled the objection, ruling that the testimony was not being offered for the truth of the matter asserted. Sgt. Fleming proceeded to explain that the older graffiti tagger told him the younger tagger texted him that it was Toscano who "went over to [the murder scene] and was shooting." Sgt. Fleming did not necessarily believe the statement, and he was unable to retrieve any text messages that met the tagger's description because he spoke to the tagger long after the messages were reported to have been sent.

During jury deliberations, the jurors sent a note to the court asking whether they could use information from the text conversation to determine whether Vilchis was present at the time of the shooting. The court responded that the text conversation "was allowed in only for the purpose of showing you why Sgt. Fleming did what he did in this investigation. It was not admitted for the truth of the conversation."

2. Analysis

Toscano argues that Sgt. Fleming's testimony about what the older teenager told him about the content of text messages the teenager had received from the younger graffiti tagger was inadmissible double hearsay. (Cf. Evid. Code, § 1201 and *People v. Zapien* (1993) 4 Cal.4th 929, 951-952 [multiple hearsay admissible if each statement covered by exception to hearsay rule].) The trial court ruled that Sgt. Fleming's testimony was admissible as nonhearsay because it was not admitted for the truth of the matter asserted but instead to explain what the officer did next in his investigation. We do not agree that this reasoning allowed for the admission of the testimony. "A hearsay objection to an out-of-court statement may not be overruled simply by identifying a nonhearsay purpose for admitting the statement. The trial court must also find that the nonhearsay purpose is *relevant* to an issue in dispute." (*People v. Armendariz* (1984) 37 Cal.3d 573, 585, italics added; see also *People v. Scalzi* (1981) 126 Cal.App.3d 901, 906-907 [evidence of officer's state of mind irrelevant and thus inadmissible when it does not tend to prove or disprove an issue in the case].)

10

Respondent argues that the text message stating Toscano "went over to [the murder scene] and was shooting" was relevant because it was part of the "sequence of events . . . to explain the officer's conduct." We are not persuaded. Toscano had already been arrested and was in custody when Sgt. Fleming spoke to the graffiti tagger. Thus, the course of Sgt. Fleming's investigation was not in dispute and the nonhearsay purpose of the statement "had no tendency in reason to prove any disputed issue of fact" in that regard. (*People v. Lucero* (1998) 64 Cal.App.4th 1107, 1109-1110 [out-of-court statement to police officer about suspect walking on counter not admissible to explain officer's conduct in lifting print of the shoe].)

We nonetheless conclude that any error in admitting Sgt. Fleming's testimony about the text message was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1163.) The trial court promptly admonished the jury that the testimony was not being offered for the truth of the matter asserted. (*Ibid.*; *People v. Lucero*, *supra*, 64 Cal.App.4th at p. 1110.) And the jurors clearly knew that the statement could not be used to prove the truth of the matter asserted, i.e., that Toscano went to the murder scene and was shooting, because the court specifically informed them in responding to a question related to codefendant Vilchis that the text "*was not admitted for the truth of the conversation.*" (Italics added.) Moreover, substantial other evidence was presented that Toscano was at the murder scene and was the shooter. (*Livingston*, *supra*, at p. 1163.) This evidence included Toscano's own statement to police, witness identification, and eyewitness testimony. Contrary to Toscano's argument, "permitting this brief mention of the out-of-court statement for a limited nonhearsay purpose did not render the trial fundamentally unfair in violation of his constitutional due process rights," because " 'there are no confrontation clause restrictions on the introduction of out-of-court statements for *nonhearsay* purposes.' " (*Livingston*, *supra*, at pp. 1163-1164, original italics.)

11

*C. The Trial Court Properly Redacted Toscano's Out-of-court Statement and Conducted a Joint Trial.*

1. Background

Two detectives interviewed Toscano for about two hours the day he was arrested. After he waived his rights to remain silent and to have counsel present, Toscano first denied being present at the shooting or being involved in any way. Upon further questioning, he changed his story and acknowledged that he drove to the scene in his truck but maintained that he did not "pull the trigger." Toscano said that Vilchis was in the back seat of a separate car that someone else drove to the scene. According to Toscano, Vilchis first kicked a truck when they arrived outside the store, then started shooting.

Toscano and Vilchis were to be tried together. The prosecution filed a motion in limine seeking to introduce a version of Toscano's statement that redacted named references to Vilchis as the shooter. Vilchis also submitted a proposed redacted version of Toscano's statement, but he simultaneously opposed the admission of any statement, arguing that the statement would still incriminate him even if redacted. He argued in the alternative that the trial court could sever the trial or conduct a joint trial with two juries.

For his part, Toscano filed a motion to *exclude* the statement, arguing that it was inadmissible because he had given it under coercion and duress. His motion requested in the alternative a separate trial. Toscano further argued that if his statement was admitted, it should be admitted in its entirety and that any redaction would prejudice his defense.

At the hearing on the motion, the court noted that if the statement was admissible, it would have to be redacted if Toscano did not take the stand because otherwise Vilchis would be denied his right to confront witnesses against him. Toscano's attorney said it was "critical" to know which portions would not be admitted, because Toscano would be unfairly incriminated if it appeared from a redacted statement that he was the only person at the shooting scene. While the parties were discussing how the statement might be redacted, the following exchange took place:

12

"[Toscano's attorney]: The Court has to look at the traditional ways of resolving that issue. One of the traditional ways of resolving it is give a separate trial to Mr. Toscano.

"THE COURT: I don't have a separate trial motion before me.

"[Toscano's attorney]: You could if that['s] what it comes down to.

"THE COURT: Because in many other parts of California they do two or three juries, but I didn't have a motion to sever or a motion for separate trial. So you can't do that at this point." Vilchis's attorney stated that she had specifically noted in her motion regarding Toscano's statement that the court could sever the trials or empanel two separate juries. The court responded that "[w]e're not at that point yet. Unless that's something you folks really want to do, we can have two juries. That's not impossible. It's just going to delay everything." The court said it would review the video of the statement before it ruled on its admissibility, and it stressed again that if the statement was admitted it would have to be redacted.

The trial court ultimately ruled that a redacted form of Toscano's statement would be admitted at trial, with it being read by Sgt. Fleming (as opposed to the jury viewing a recording of the interview). After the court ruled on the redactions, Toscano filed formal objections to the way the trial court had edited the statement.

At trial, Sgt. Fleming testified about his interview with Toscano, substituting references to Vilchis with references to generic phrases such as "somebody" and "another guy." According to Sgt. Fleming, Toscano said he attended a gathering at the home of the younger graffiti tagger on the evening of the shooting, and the tagger came to the home at some point and said he had been beaten up at the discount store. People in the home, including Toscano, went to the store. Toscano drove there by himself in a truck, and the younger graffiti tagger was in another vehicle. When they arrived at the store, everyone got out of the vehicles except the younger graffiti tagger. According to Sgt. Fleming, "Mr. Toscano said it was him, another guy, and Manche [the nickname of someone who had been at the family gathering] and another guy were driving" in the other vehicle. Toscano reported that "somebody kicked [a] vehicle as they were walking

13

up to the gate" near the store. Toscano "said they all walked up to the gate, to the black gate, and one of the—one of the Ayesh brothers was walking towards the gate and Toscano said that somebody started shooting." Toscano said that after the shooting, he ran to his truck and drove home.

On cross-examination, Sgt. Fleming testified that Toscano told him he drove in one car, and that three other people were in the other car. Sgt. Fleming named two of those people and referred to the third as "another guy." After being pressed on whether Toscano had actually said there were four people in the second car, Sgt. Fleming testified, "I thought he [Toscano] said it was at least three. Because he would never tell me the exact number of people who was in the car." Toscano's attorney also elicited further testimony establishing Toscano had said the shots were fired by someone who was with him.

2. Analysis

In interrelated arguments, Toscano contends that the trial court erred both in admitting the redacted version of his statement and in not severing his trial from Vilchis's. Section 1098 provides that defendants who are jointly charged with any public offense *must* be tried together unless the court orders otherwise. Where the extrajudicial statements of one defendant implicate a codefendant and the defendant does not take the stand at trial, it is a denial of the codefendant's right to confrontation under the Sixth Amendment to admit the statement in unredacted form. (*Bruton v. United States* (1968) 391 U.S. 123, 137 (*Bruton*); *People v. Aranda* (1965) 63 Cal.2d 518, 529-530.) Where the prosecution seeks to introduce such a statement "the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, [this] mean[s] not only direct and indirect identifications of codefendants but [also] any statements that could be employed against nondeclarant codefendants once their identity is otherwise established. (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution

14

has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible." (*Aranda*, at pp. 530-531, fn. omitted.) As for the second option, to sever trials, "[s]everance may be necessary when a defendant's confession cannot be redacted to protect a codefendant's rights without prejudicing the defendant. [Citation.] A defendant is prejudiced in this context when the editing of his statement distorts his role or makes an exculpatory statement inculpatory." (*People v. Lewis* (2008) 43 Cal.4th 415, 457, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919-920.)

In a confusing argument, Toscano first contends that "the trial court erred in ruling the requested alternative remedy brought by appellant on September 13, 2012, or request for leave to bring a separate formal motion on September 28 was untimely [*sic*]." But the trial court never ruled that any such request was untimely. At the pretrial hearing on Toscano's September 13 motion to exclude his statement to police, the parties discussed with the trial court the alternative of severing the trials. True enough, the trial court mentioned that no motion for a separate trial was pending and that it was premature to consider such a remedy because the court had not yet ruled on Toscano's motion to exclude the statement altogether. But the court did not deny the request on timeliness grounds or bar Toscano from raising the issue in the future, as Toscano now seems to suggest. The court also did not mistakenly believe it lacked discretion to consider such a request, as it specifically stated that having two juries was "not impossible."

More substantively, we disagree with Toscano's argument that severance was necessary to avoid prejudicial error. Toscano acknowledges that the jury learned he claimed someone else shot the victim, but he contends "the significant exculpatory force of [his] statement was not based on th[e] fact that he denied responsibility, but that he identified the shooter by name." He argues that "[t]he difference between blaming an unidentified individual as opposed to identifying by name the actual shooter is substantial. The obvious difference is that an unidentified individual cannot tell their side of the story or refute in any way what the declarant has said. In other words, there is

15

accountability for the declarant *where the culprit is positively identified*." (Italics added.) But *Bruton*, *supra*, 391 U.S. 123, *Aranda, supra*, 63 Cal.2d 518, and their progeny compelled the trial court to remove such positive identification in order to protect Vilchis's constitutional rights. (*Bruton*, at p. 137; *Aranda*, at pp. 529-530; see also *Gray v. Maryland* (1998) 523 U.S. 185, 192 [redacting confession with obvious indication of deletion improper where redaction clearly implicates defendant who is subject of deletion].) We reject Toscano's argument that by referring to the shooter as "another guy" and not specifically naming Vilchis, the redaction distorted Toscano's role or transformed his exculpatory statement into an inculpatory one. (*People v. Lewis*, *supra*, 43 Cal.4th at p. 457; see also *People v. Orozco* (1993) 20 Cal.App.4th 1554, 1565-1566 [determination of whether to replace defendant's name with neutral pronoun considered on case-by-case basis].)

Contrary to Toscano's claims, his situation is distinguishable from *People v. Stallworth* (2008) 164 Cal.App.4th 1079 because in that case the trial court's redactions rendered the defendant's account that there was another shooter implausible and incomplete because the redactions removed any mention of more than one shooter. (*Id.* at pp. 1092-1096.) The court held it was improper to "not us[e] a placeholder to indicate" there was a second shooter, which would have preserved that second shooter's rights under *Aranda* and *Bruton* but also avoided creating inconsistencies in defendant's story by making it differ from other accounts of the crime. (*Stallworth*, at pp. 1096-1097.) Here, of course, the redaction used a placeholder instead of Vilchis's name, which created no such inconsistencies.

We also reject Toscano's argument that declining to sever the trials made Toscano's defense (that codefendant Vilchis was the shooter) conflict with Vilchis's defense (that Vilchis was not at the shooting). We see no such conflict. The prosecution's theory of the case was that Toscano, Vilchis, and two others approached the Ayeshes and that Toscano fired the shots that killed Samier. Toscano did not dispute he was at the scene but claimed he was not the shooter. Although Toscano was unable at trial to specifically name Vilchis as the shooter as he had in his statement to police, he

16

had ample opportunity to shift blame away from himself. In closing argument, Toscano's attorney argued that to determine who was really the shooter, jurors would "have to consider *all of the other persons that were there at the scene*," including one of the graffiti taggers and two other people the attorney named, all of whom had been placed in various lineups. (Italics added.) In other words, accepting Toscano's defense that he was not the shooter was not antagonistic to Vilchis's claim that he was not present at the murder scene, because at least three *other* people were identified as possible shooters.

> D. *The Trial Judge Did Not Commit Misconduct by Commenting on an Expert Witness's Testimony or Questioning the Expert.*

Toscano argues that the trial court committed prejudicial misconduct and violated his rights to a fair trial and due process because it briefly questioned an expert and made an isolated remark about the expert's testimony. We are not persuaded.

1. No misconduct for trial court to comment on expert witness's fee.

a. Background

An expert in eyewitness memory and identification testified on behalf of defendant Vilchis. She testified about 13 factors that affect a person's memory and how those factors relate to the accuracy of eyewitness identifications. On cross-examination, the prosecutor asked the expert about how she was paid for her work on this case:

"Q. Okay. I believe you also talked about how much your fee would be for your work; is that right?

"A. That's right.

"Q. And to make sure I heard you correctly, $150 per hour?

"A. Yes.

"Q. How many hours did you work in this particular case?

"A. The last year about 15.

"Q. And then you get an additional [$]1800 to come here and then to provide the information that you provided us today?

"A. That's a court approved rate, yes.

"Q. You still get your payment from [Claremont College], correct?

"A.    I'm employed there.

"THE COURT:    *When you say court approved, that's not me.*

"THE WITNESS:    I'm not sure who actually signed the piece of paper from the superior court, but it's from the superior court. No, I don't think it was you. You hadn't been assigned to the case at that point, but it's the superior court.

"[The prosecutor]:    At this point you're certain though it's the courts that are paying for this, not necessarily the defendant or his family?

"A.    Oh, absolutely. No, it's not the defendant or his family." (Italics added.)

b.  Analysis

Toscano argues that the trial judge's comment, italicized above, "created the impression that he [the judge] personally would not have approved the rate, and improperly took on the role of a witness by adding to the evidence." Toscano further argues that the comment "was clearly improper as it discredited [the expert's] testimony" and that the judge "stepped outside his judicial role by separating himself from the previous actions of the trial court in approving [the expert's] rate." To preserve this issue for review, Toscano was required to timely object, which he did not do. (*People v. Cash* (2002) 28 Cal.4th 703, 730.) But even if we assume that the argument was properly preserved, we conclude that it lacks merit.

"We determine the propriety of judicial comment on a case-by-case basis in light of its content and the circumstances in which it occurs." (*People v. Cash*, *supra*, 28 Cal.4th at p. 730.) "The role of a reviewing court 'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial. [Citation.]' [Citation.] In deciding whether a trial court has manifested bias in the presentation of evidence, we have said that such a violation occurs only where the judge ' "officiously and unnecessarily usurp[ed] the duties of the prosecutor . . . and in so doing create[d] the impression that he [was] allying himself with the prosecution." ' " (*People v. Harris* (2005) 37 Cal.4th 310, 347.)

18

It is unclear why the trial court briefly commented on the approval of the expert's fees, but the comment appears to have been accurate (that the judge did not approve the expert's trial fee) and not clearly disparaging of the expert. In our view, the fleeting remark falls far short of betraying a bias against defendant or his attorney and did not prejudice Toscano. (*People v. Harris*, *supra*, 37 Cal.4th at p. 347; *People v. Cash*, *supra*, 28 Cal.4th at p. 731.) Toscano's reliance on *People v. Sturm* (2006) 37 Cal.4th 1218 is misplaced because the trial court in that case, unlike the court here, made egregious and obviously biased remarks. *Sturm* presented "unique facts" where the trial judge "engaged in a pattern of disparaging defense counsel and defense witnesses in the presence of the jury" and "*frequently* interpose[d] objections to defense counsel's questions." (*Id.* at p. 1238, italics added.) In contrast, the trial court's fleeting comment here was neither frequent nor particularly disparaging, and the expert was provided with the opportunity, which she exercised, to respond to it. In short, we conclude that the comment was of little significance and did not prejudice Toscano's rights to a fair trial and due process.

2. No misconduct for trial court to question expert witness.

a. Background

After the attorneys had finished questioning the expert witness, the trial court also asked the witness several questions, all without objection:

"THE COURT: Okay. Professor, has there ever been a study where instead of just taking one factor, let's say what is your first [factor], distance, where they put all of the 13 factors together?

"THE WITNESS: There has not been a study where these particular 13 factors have all been put in the same study, but there have been many studies that have used a combination of these factors.

"THE COURT: Not one that shows all 13?

"THE WITNESS: No.

"THE COURT: Your 13 are different than other psychological factors that other people testify to?

19

"THE WITNESS:    Well, these are the 13 factors that I found to be relevant in this particular case.  In different cases more or less factors could be relevant.  If the eyewitness, for example, needed glasses but didn't have them on, that would be relevant.  If he had consumed drugs or alcohol, that would be relevant.  Age differences in the eyewitnesses, that would be relevant.  [¶] So, in other words, this is not an exhaustive list of all possible factors.  It's just the factors I found to be relevant in this case.

"THE COURT:       Okay.  Can a blind person ever make an accurate I.D.?

"THE WITNESS:    A blind person could select the correct person from the photographic lineup by using the same procedure that I talked about with the selecting who was the treasury secretary and picking Tim Geithner out of the list without even knowing who Tim Geithner is.[6]  So a blind eyewitness could identify the suspect from a lineup, but it would not be because he remembered him from the lineup.

"THE COURT:       How could they see the photographic lineup?

"THE WITNESS:    How could they see the suspect?  I mean in both cases they're blind.  They can't see them.

"THE COURT:       So a blind person could never make an accurate I.D.?

"THE WITNESS:    They can use voice identification, smell identification or something else.

"THE COURT:       So they could make an accurate I.D.?

"THE WITNESS:    Not visually.  Using some other sensory modality, sure.

---

**6** This was a reference to the expert's testimony on direct examination to illustrate the importance of a fair and unbiased photographic lineup, which is like a multiple-choice quiz.  She explained that if a person were given a multiple-choice question asking for the identification of the Secretary of the Treasury, and the person selected Geithner from a list that included Clint Eastwood, Michael Phelps, Antonio Villaraigosa, and Al Pacino, the "right" answer would not necessarily demonstrate the person knew who Geithner was, only that the person knew the other celebrities on the list were not the Secretary of the Treasury.  Similarly with photographic lineups, the expert explained, sometimes it first appears "impressive" that a person selects a suspect, but it might be more a function of the photograph being the only one in the lineup matching the description of the suspect.

"THE COURT:     Okay.  Would you agree that the mind is the most, I don't know what you call it, wonderful organ in the human body?  Let me ask it this way.  Do we know everything about the brain?

"THE WITNESS:    Oh, no, of course not.  I expect to be studying these processes all my life and other people as well.  The brain mechanisms by which these processes occur will be studied for a long time.

"THE COURT:     So what it was in the past, we certainly know a lot more now than we did before?

"THE WITNESS:    Well, we continue to understand why these factors affect memory, and that's where the research is going now; why do these factors affect memory?  But the fact that they do affect memory has been well known for a long time.

"THE COURT:     Okay.  But the fact of the matter is we don't know a whole lot about the brain?

"THE WITNESS:    I totally disagree.  I've been talking for hours on how the brain works and other people can go on much longer.

"THE COURT:     We know a lot more now than we did before?

"THE WITNESS:    Yes.

"THE COURT:     We don't know everything about the brain?

"THE WITNESS:    I agree.

. . .

"THE COURT:     Thank you very much."

In his closing argument to the jury, the prosecutor stated that the standard jury instruction covers the factors addressed by the expert's testimony, "because a lot of it is common sense," suggesting that the expert's testimony did not add anything beyond what the law already requires when considering the accuracy of eyewitness identification.  During her closing argument, Vilchis's attorney stressed that the expert witness's identification studies were "accepted science" that were not challenged at trial by the

21

production of any contrary expert testimony.[7] On rebuttal, the prosecutor suggested it was more cost-effective for the district attorney's office to cross-examine a witness than to hire its own. He also said there was "no way" the expert was going to say anything inconsistent with what she had testified to on 300 previous occasions. The prosecutor continued, without objection:

"Think about her [the expert's] testimony for one moment. I'll give you one example. The Judge asked her about a blind person making an I.D. Do you remember what she did? She went right back up there to those 13 things. If the blind person was one, two, three, four, five, six, seven, eight, nine, ten, all the way through 13, then yes. The Judge had to remind her, had to remind her that we were talking about a blind person."

### b. Analysis

Toscano contends that the trial court's "repeated questioning" of the expert witness "clearly conveyed to the jury the trial judge's negative opinion towards [the expert's] testimony." According to Toscano, the trial court "improperly took on the role of advocate for the prosecution" and "reinforced his negative personal views of [the expert's] testimony to the jury." Because no one who testified was blind, Toscano reasons, it was "inconceivable that the trial judge was pursuing the subject for any legitimate purpose," and the questioning "created the unmistakable impression that the trial judge was chastising and attempting to discredit the witness."

Again, by failing to object to the trial court's questioning, the issue was not properly preserved for appeal. (*People v. Harris*, *supra*, 37 Cal.4th at p. 350.) But, as we did with the previous argument, we conclude that this argument lacks merit even if we assume it was properly preserved. Evidence Code section 775 permits a court to question

---

[7] Counsel also spoke at length about the 13 factors the expert witness described and argued that applying them in this case demonstrated the eyewitness identification was "less reliable and more suspect." By contrast, Toscano's attorney mentioned the expert witness only in passing during closing argument, telling jurors they should consider "in detail" relevant factors to accurate eyewitness identifications set forth in the relevant jury instructions and mentioned by the expert witness as well.

witnesses, including expert witnesses, to help elicit the truth, to prevent misunderstanding, to clarify testimony or cover omissions, to allow witnesses the opportunity to explain, and to elicit facts material to a just determination of the cause. (*Harris*, at p. 350.) " 'The constraints on the trial judge's questioning of witnesses in the presence of a jury are akin to the limitations on the court's role as commentator. The trial judge's interrogation "must be . . . temperate, nonargumentative, and scrupulously fair. The trial court may not . . . withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power." ' " (*Ibid.*)

We cannot tell from the cold record what tone the trial judge took when questioning the expert or whether the questions were motivated by skepticism, curiosity, or both. But we cannot conclude that the questions were necessarily improper, and we have no reason to believe that the jury failed to follow the court's jury instruction that nothing the judge said or did were intended "to intimate or suggest what you [the jurors] should find to be the facts, or that I believe or disbelieve any witness. [¶] If anything I have done or said has seemed to so indicate, you will disregard it and form your own conclusion." (CALJIC No. 17.30; accord *People v. Harris*, *supra*, 37 Cal.4th at p. 350 [even though some of trial court's questions were "inappropriate," reviewing court must assume jurors followed instruction not to decide case based on what court said or did].)

The facts here are a far cry from those in *People v. Santana* (2000) 80 Cal.App.4th 1194, and Toscano's reliance on that case is therefore misplaced. In *Santana*, the trial court "repetitiously, disparagingly and prejudicially questioned" three defense witnesses (including defendant) and continued adversarial questioning "for page after page of reporter's transcript," thereby creating "the *unmistakable impression* it had allied itself with the prosecution in the effort to convict Santana." (*Id.* at p. 1207, italics added.) Santana's trial counsel objected at one point that the trial judge used facial expressions that indicated he did not believe Santana's testimony. (*Id.* at p. 1205.) Although there was no evidence on the cold record of such a claim (which the trial court had disputed, *ibid.*), the appellate court concluded that "[e]ven had the trial court conducted its cross-

23

examination in deadpan, the tone of the examination, as well as its purpose, is evident."
(*Id.* at p. 1208.)  Here, by contrast, the questioning concerned only one witness called by a codefendant, was relatively brief, and was only possibly—but clearly not unmistakably—allied with the prosecutor's position.  The questioning did not result in an unfair trial or unduly prejudice Toscano.

### III.
### DISPOSITION

The judgment is affirmed.

_____
Humes, P.J.

We concur:


_____
Dondero, J.


_____
Banke, J.

*People v. Toscano* (A137606)