Filed 7/15/16  P. v. Hernandez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. JUSTIN R. HERNANDEZ et al., Defendants and Appellants. | D069663 (Super. Ct. No. FSB1301847) |

APPEALS from judgments of the Superior Court of San Bernardino County, J. David Mazurek, Judge.  Judgments affirmed as modified with directions.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Justin Hernandez.

Cynthia Ann Grimm, under appointment by the Court of Appeal, for Defendant and Appellant Alyssa Aguilar.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Sharon L. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

Following a joint trial, a jury convicted Justin Hernandez and Alyssa Aguilar of second degree robbery (Pen. Code, § 211)[1] and conspiracy to commit robbery (§§ 182, subd. (a)(1), 211). The jury additionally found Hernandez guilty of being a convicted felon in possession of a firearm (§ 29800, subd. (a)), he was personally armed with a firearm during the robbery (§ 12022.53, subd. (b)), and Aguilar committed the robbery with a principal she knew was armed with a firearm (§ 12022, subd. (a)(1)). The trial court increased Hernandez's sentence based on findings of a prior "strike" conviction and four prior prison terms.[2] (§§ 667.5, subds. (b)-(i), 1170.12, subds. (a)-(d).)

Hernandez and Aguilar (together defendants) raise various claims of error in their appeals. They assert violations of the confrontation clause based on the admission of a codefendant's pretrial testimonial statements implicating the other; neither defendant testified at trial nor was subject to cross-examination, and the jury was not instructed that each defendant's statements could only be considered as evidence against that defendant. The People concede the instructional error, but argue it was harmless beyond a reasonable doubt. Defendants also raise several jury instruction errors on claimed lesser included offenses or defenses. Further, they argue the evidence was insufficient to support Hernandez's use of a firearm during the robbery. Finally, defendants assert they should be jointly and severally liable for the direct victim restitution ordered by the trial

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] Hernandez filed a petition for writ of habeas corpus challenging his enhanced sentence.

court. For reasons we will explain, the judgments will be affirmed as modified to reflect defendants are jointly and severally liable for direct victim restitution.

FACTUAL AND PROCEDURAL BACKGROUND

On April 29, 2013, Aguilar was working the closing shift with Lorena Mancilla at Taco Bell on Big Bear Boulevard in Big Bear City, a small mountain community. Aguilar had worked at Taco Bell for about a year and was familiar with its procedures. Mancilla testified about Taco Bell's standard closing procedures in that timeframe: The lobby of the restaurant closed at 9:00 p.m., employees cleaned the lobby, and the cashier would leave. The shift leader was responsible for locking the doors to the restaurant, of which there were two—the front one and a side door. Meanwhile, the Taco Bell drive-up window remained open for another hour and closed by 10:00 p.m.

Mancilla was the shift leader on April 29. The last cashier cleaned the lobby and left a little after 9:00 p.m., leaving only Mancilla and Aguilar in the restaurant. Aguilar offered to switch duties with Mancilla and be the one responsible for locking the doors, and Mancilla agreed. Mancilla cleaned the kitchen while Aguilar was supposed to lock the doors. Closer to 10:00 p.m., Aguilar was checking to see if the side door was locked, she returned, and told Mancilla that Angel Hernandez was going to the drive-up window. Angel was a former employee of Taco Bell. As Mancilla was talking to Angel at the drive-up window and fixing him a soda, Angel noticed, from his car, something happening inside the restaurant.

Mancilla turned and observed the following. Aguilar was walking behind the register counter into the kitchen area, looking scared, followed by a man "crouching"

3

behind her. From where she was standing, Mancilla could see he had a gun in his hand; she saw part of a "small, black" handgun. The man instructed Mancilla to close the drive-up window, which she did. At the man's insistence, she opened a safe in the front of the restaurant. Mancilla testified that the "outer" portion of the safe held a set amount of cash ($650) in typically low-denominations ($1 and $5 bills) to provide the cashiers and cash registers with enough change throughout the day. Mancilla had a key, was able to open the outer safe, and proceeded to fill a Taco Bell bag with cash.

Next, the man told her to open the "box," referring to the "inner" portion of the safe. The inner safe held all the cash dropped in by cashiers throughout the day from their registers, but it was on a timer and could not be opened in the evening. As Mancilla was trying to open it, Aguilar volunteered, "I have more money over here," pointing out the drive-thru cash register. Aguilar told Mancilla to give her the keys. The man instructed Mancilla to go to the back of the store, while Aguilar was with the robber at the drive-thru register. Mancilla could not see what was happening in the drive-thru area. She later told an officer that Aguilar's actions seemed odd since the robber had not asked for money from the drive-thru cash register. The man ultimately left out the side door. Mancilla suggested that she and Aguilar lock themselves in the walk-in freezer, and from there, Mancilla called 911.

Mancilla's recorded 911 call was played for the jury. In the call, she reports a robbery just occurred at Taco Bell, by a guy with a gun, his face was covered by a bandanna, he was wearing a hat, and he "seemed to be short." Additionally, she told the

4

911 operator that the gun she saw was short and black. Approximately $750 was stolen, primarily in $1 and $5 bills.

Two peace officers responded to the 911 call around 10:00 p.m. The main door of Taco Bell was locked. The officers entered through the side door, which was partially open. They observed a wad of Taco Bell napkins had been placed in the doorjamb to prevent the door from closing. Otherwise, the door would automatically close by itself. The officers found Mancilla and Aguilar hiding in the freezer of Taco Bell.

Officers spoke to Mancilla and Aguilar separately. Mancilla described the robber as a man, between five feet five inches and five feet seven inches tall, wearing a bandanna over his face, a baseball cap, a gray "hoodie," and sunglasses. Aguilar provided her home address and a similar description of a male robber. One officer recalled he had conducted a traffic stop the prior evening of a driver matching the robber's description, and the officer began thinking of that driver as a suspect. The driver was Hernandez. Hernandez's driver's license shows his height to be five feet five inches. During the traffic stop, he had been wearing a black baseball cap and driving a black Ford sport utility vehicle (SUV) registered to someone else. The black SUV was later established by its license plate number and appearance to be Aguilar's car.

Early the next morning, Donald Dargis saw Hernandez at The Cottages, a sober living residential facility located less than a mile from Taco Bell, wearing jeans, a hoodie, a baseball hat, and sunglasses. Dargis, who is the property manager, had previously asked Hernandez to leave the facility for not paying rent and not being sober. On the morning of April 30, Hernandez was not supposed to be there, and Dargis asked him to

5

leave.  Hernandez told Dargis he spent the night because he had nowhere else to go.  Officers would later locate a gray hooded sweatshirt left behind at The Cottages.

In past weeks when Hernandez had been a tenant, Dargis had seen him coming and going in Aguilar's black SUV with "nice rims."  Through stipulation, the People established that, several days before the robbery, an officer spoke "with Justin Hernandez[,] who said he had already moved from [The Cottages] to [Aguilar's home address] and planned to stay there temporarily until he could save enough money for rent, and that he planned to move back to The Cottages once he was able to do so."

Officers were continuing their investigation of the robbery.  Aguilar maintained she did not recognize the robber.  She also disclosed owning a black SUV with "nice rims."  In trying to help an officer with the Taco Bell surveillance video settings, she said it was not working and it had not been working.  Later, a deputy sheriff obtained a surveillance video from a nearby restaurant; the neighboring restaurant's camera captured a part of Taco Bell's parking lot.  In the video, several minutes before police cars could be seen responding to the 911 robbery call, a dark-colored SUV circled through the parking lot.  Although the video quality was grainy, the deputy sheriff testified that the vehicle on the video resembled Aguilar's black SUV.

On May 1, before 9:00 a.m., Valerie Montenegro was working at a market in Big Bear City.  She had heard on the radio and was then reading in the local newspaper about the Taco Bell robbery by a man driving a black SUV.  At that moment, a man fitting the newspaper's description came into her market holding a ripped plastic bag filled with inches-thick "bundles" of cash.  The man was Hernandez.  Montenegro testified that

6

Hernandez held out his bag to her as if to exchange the money contained inside, and asked if she needed any $1 or $5 bills. She said they did not, and he left the market. She watched him walk to the laundry mat and donut shop across the street, and then, to a black SUV, where he opened the door and stood by it. Montenegro had alerted her fellow coworker, who called the sheriff. Hernandez was at the black SUV when officers arrived. They arrested him.

Officers searched the black SUV, i.e., Aguilar's car. They located "a large sum of money in low-denomination bills" in the center console of the car—two hundred twenty-nine $1 bills and twenty-one $5 bills, or $334. They found other items in the car, including gloves; a bag of clothes, some of which matched what the robber had been described to be wearing; a pair of glasses featuring transition lenses, or lenses that would darken/lighten depending on lighting; a Taco Bell hat; some Taco Bell clothing; several Taco Bell bags; and a carbon dioxide cartridge that can be used to propel projectiles from a BB or pellet gun. Officers found a "large amount of money" on Hernandez's person, or almost $200. In total, officers found about $525 in the car or on Hernandez.

Detective Jeremy King interviewed Hernandez while he was in police custody and after he had waived his *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436) rights. When the detective asked him where he had been between 9:00 p.m. and 1:00 a.m. on April 29 and 30, Hernandez gave "conflicting statements" and had no concrete explanation of his whereabouts. He said he had been on his way to Taco Bell, but never got there. He did not have a job, did not have a source of income, and had no money. Nevertheless, Hernandez said that some of the cash found in Aguilar's car belonged to him, and not to

7

Taco Bell. He said that he had obtained a quote of $290 to fix Aguilar's car, which was experiencing mechanical problems.

As far as the robbery, Hernandez told Detective King that there "wasn't actually a robbery," no one had gotten hurt, and no one should get caught. He did not explain how he knew this information. He also said that he knew it would not be hard to rob Taco Bell and he knew Taco Bell's surveillance video did not work because it was "common knowledge." In a subsequent joint interview of Hernandez and Aguilar, Hernandez continued to adamantly deny that there had been a robbery, and said "[i]t was just a theft of money." He told the officers that "if he had committed the crime, he would not tell" them. He also said, "Fuck the truth" and the truth would not help him. In essence, Hernandez conveyed to officers that the robbery was made up. On cross-examination, Detective King testified that Hernandez had spoken to Aguilar on the phone shortly after the robbery occurred, and she had told him what had happened.

After her car was searched and Hernandez was arrested, Aguilar voluntarily agreed to go to the officer's station twice to speak to officers, once jointly with Hernandez. Through the interviewing officers' testimony at trial, Aguilar's edited/redacted statements were introduced to the jury.[3] The crux of her statements was that Aguilar was informed money would be stolen from Taco Bell on the morning of the day it happened. Someone brought up the idea to her. She was asked who would be working that evening. She had been asked to leave her cash register out, which she

---

[3]    As will be discussed, many of Aguilar's statements were edited to a passive voice to avoid identification of a coconspirator's gender.

fluctuated on and decided she could not do. The idea of a break-in had been raised, but an alarm would sound. Aguilar told officers she had not known when things would happen, she thought it would happen after all the employees left, and she had hoped nothing would happen. At the same time, she was looking around for someone during her shift, and she also contemplated but rejected the idea of alerting the police in advance. Aguilar admitted she was low on cash and needed money to fix her car.

DISCUSSION

I

*Defendants' Pretrial Testimonial Statements Made to Police*

Hernandez contends officers' testimony about Aguilar's out-of-court statements, which implicated Hernandez, violated his right to confrontation. Similarly, Aguilar contends an officer's testimony about Hernandez's out-of-court statements, which implicated Aguilar, violated her right to confrontation. Although we agree that errors occurred under the confrontation clause (*Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*); *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*)), the errors were harmless beyond a reasonable doubt.

A. The Confrontation Clause, *Crawford*, and *Aranda*/*Bruton*

The confrontation clause grants every criminal defendant "the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) It gives defendants in state prosecutions the right to cross-examine the witnesses making testimonial statements against them. (*Crawford, supra,* 541 U.S. at pp. 68-69.)

A threat to the confrontation clause can arise when the state tries two defendants

9

together, and the prosecution seeks to introduce evidence of one defendant's out-of-court statements implicating the other defendant.  (*People v. Fletcher* (1996) 13 Cal.4th 451, 455 (*Fletcher*).)  Generally, the self-incriminating extrajudicial statement will be admissible against the declarant.  (*Ibid.*)  However, "unless the declarant submits to cross-examination by the other defendant (the nondeclarant), admission of the [statement] against the nondeclarant is generally barred both by the hearsay rule [citation] and by the confrontation clause."  (*Ibid.*)  In a joint trial, "the trial court may instruct the jury to consider the [statement] in determining the guilt only of the declarant, but it may be psychologically impossible for jurors to put the [statement] out of their minds when determining the guilt of the nondeclarant."  (*Ibid.*; see *Aranda, supra,* 63 Cal.2d at p. 529 [discussing the jury's "overwhelming task" of having to follow a limited use instruction]; *Bruton, supra,* 391 U.S. at pp. 135-136 [jury instruction may not suffice when the extrajudicial statements are "powerfully incriminating"].)

*Aranda* and *Bruton* also discussed whether these incriminating statements would be admissible if they are redacted to delete references to other defendants.  *Aranda* contemplated redacted statements would be admissible only "if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted." (*Aranda, supra,* 63 Cal.2d at p. 530.)  The court explained, "By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established."  (*Ibid.*)  The court's use of the phrase, "can be and are effectively deleted," implies effective redaction would be impossible in some joint trials.  (*Ibid.*)  Determining

10

whether effective redaction is possible "would depend on the evidence linking the defendants together before and after the crime and on the actual statements made by the declarant defendant." (*Id.* at p. 530, fn. 10.)

The United States Supreme Court and California Supreme Court later clarified what constitutes effective redaction. (*E.g. Richardson v. Marsh* (1987) 481 U.S. 200, 211 [holding a redacted statement is admissible only if the redaction "eliminate[s] not only the [nonconfessing] defendant's name, but any reference to his or her existence"].) In *Fletcher*, a redacted confession replaced references to the nonconfessing defendant's name with the phrases, "a friend" and "they." (*Fletcher, supra,* 13 Cal.4th at p. 459.) *Fletcher* held these nonspecific references violated the confrontation clause because *other evidence* suggested the unnamed "friend" was the nonconfessing defendant and the statement implied both defendants (i.e., "they") had criminal intent, an issue the nonconfessing defendant contested. (*Id.* at pp. 469-470.) A redacted statement "will be deemed insufficient to avoid a confrontation violation if, despite the editing, reasonable jurors could not avoid drawing the inference that the defendant was the coparticipant designated in the confession by symbol or neutral pronoun." (*Id.* at p. 456.) The court instructed, "[T]he sufficiency of this form of editing must be determined on a case-by-case basis in light of the statement as a whole *and* the other evidence presented at the trial." (*Id.* at p. 468, italics added.)

B. The Errors Were Harmless Beyond a Reasonable Doubt

The trial court did not limit the use of defendants' out-of-court testimonial statements, and the jury was permitted to consider each declarant's statements against his

11

or her codefendant in violation of the confrontation clause. Moreover, although the parties and trial court attempted to redact/edit the statements introduced through testifying officers, the deletions were not effective. Considered with other evidence at trial, certain of Hernandez's statements tended to incriminate Aguilar, and vice-versa. For example, Hernandez's statements about a fake robbery and his knowledge of Taco Bell's nonfunctioning surveillance camera suggested Aguilar's involvement. Further, although many of Aguilar's statements were edited from active to passive voice to avoid direct implication of Hernandez, e.g., "I was told all I have to do is leave the money out," it would have been difficult if not impossible for the jury to avoid drawing an inference that Hernandez was the one talking to Aguilar about a robbery. The two were closely linked together by other evidence in the record.

We conclude the errors do not require reversal of their convictions. "It is established, of course, that *Bruton*/*Aranda* error is not prejudicial per se." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1128.) Rather, "such error must be scrutinized under the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18." (*Anderson, supra,* at p. 1128.) "[I]f the properly admitted evidence is overwhelming and the incriminating extrajudicial statement is merely cumulative of other direct evidence, the error will be deemed harmless." (*Id.* at p. 1129.)

Other evidence was sufficiently strong to render the errors harmless. Notably, defendants' voluntary statements could be properly considered against themselves. (Evid. Code, § 1220 [party admission].) Aguilar partially admitted her own knowledge and participation in the planning and commission of the robbery, and she admitted a motive.

12

She was a Taco Bell employee familiar with the restaurant's procedures, was responsible for locking the doors on the night of the robbery yet the side door was left unlocked, she facilitated the robbery while it was in progress, her vehicle resembled the suspect's car seen on a surveillance video, she was living with a man who matched the gun-wielding robber's description, and large amounts of cash as well as likely instruments used during the robbery were recovered from her vehicle.

Furthermore, Hernandez's statements demonstrated a strong consciousness of guilt and knowledge of facts he would not know were he innocent. He thoroughly matched the physical description of the male robber. He had no alibi during the time of the robbery. He had admittedly been living with Aguilar, a Taco Bell employee. Even so, he did not return to her home on the night of the robbery, having been alerted to police presence. The male robber entered Taco Bell at a time when the side door would normally already be locked, indicating inside assistance. Hernandez was arrested at a black SUV that matched the description of the suspect's black SUV, which witnesses had previously seen him driving. Despite having no job or source of income, he was discovered with hundreds of dollars in low-denomination bills, similar to or the same as those stolen recently from Taco Bell.[4] He had been trying to launder the bills, supporting a reasonable inference under the circumstances that they were stolen. Aguilar's incriminating statements were thus "minor corroboration of strong, independent evidence" that Hernandez was the robber and had conspired to commit the robbery.

---

[4] Hernandez appears to concede in his reply brief that these were "proceeds of the robbery."

(*People v. Jacobs* (1987) 195 Cal.App.3d 1636, 1654.) The admission of each defendant's statements against his or her codefendant was harmless beyond a reasonable doubt.

## II

### *Jury Instructions*

A. Accomplice Testimony

Aguilar contends the court erred by not sua sponte instructing the jury to determine whether Hernandez was her accomplice and if so, his statements required corroboration, would be insufficient alone to convict her, and should be viewed with caution. (See CALCRIM Nos. 334 & 301.) The People contend the court had no sua sponte duty to provide such instructions.

Irrespective of whether the trial court was required on its own motion to provide accomplice instructions vis-à-vis Hernandez's out-of-court statements, we conclude any error was harmless. Hernandez's theory at trial was one of mistaken identification, i.e., he argued he was not the one who robbed Taco Bell. None of Hernandez's statements were directed at incriminating Aguilar—they only *became* incriminating because of other evidence linking the two, such as that he matched the robber's physical description, the surveillance camera was not in fact operational, and witnesses saw him drive her car both before and after the robbery. The jury would have only conceivably viewed Hernandez's statements as those of an accomplice because of how thoroughly the statements were corroborated by independent evidence. As discussed above, notwithstanding Hernandez's

14

out-of-court statements, ample evidence established Aguilar's guilt. She has not demonstrated any possible harm from the absence of accomplice-related instructions.

B. Defense of Duress

Aguilar contends the trial court erred by not sua sponte instructing the jury on the defense of duress. Her theory at trial was that she came to some kind of agreement with Hernandez involving a theft of money from Taco Bell, but not in the form of a robbery. She maintains she did not know in advance that a robbery would occur.

A trial court has a sua sponte duty to instruct regarding a defense if there is substantial evidence to support the defense and it is not inconsistent with the defendant's theory of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) In deciding whether there is substantial evidence, "the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.)

Duress is available as a defense to defendants who commit a crime "under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." (§ 26, subd. Six; *People v. Wilson* (2005) 36 Cal.4th 309, 331.) "Duress is an effective defense only when the actor responds to an immediate and imminent danger." (*People v. Heath* (1989) 207 Cal.App.3d 892, 900.)

The trial court was not required to sua sponte instruct on duress. The defense of duress is inconsistent with Aguilar's theory of the case and not supported by substantial evidence. Aguilar and Hernandez lived together and had contemplated various ways of

15

stealing money from Taco Bell. At minimum, she knew to expect someone on the night of the robbery, and she rejected the idea of calling police. She left the side door of Taco Bell unlocked, and while the robbery was in progress, she volunteered a way for Hernandez to get more money. Even if Aguilar was initially surprised by the appearance of a gun, she knew with certainty that the "robber" just wanted money, and she knew where the money was. Thus, she knew her life was not in any real danger. There was insufficient evidence that Aguilar possessed a reasonable belief of her life being endangered if she refused to participate in robbing or conspiring to rob Taco Bell.

C. Conspiracy to Commit Petty Theft

Aguilar next contends the trial court erred by not sua sponte instructing the jury on conspiracy to commit petty theft as a lesser included offense of conspiracy to commit robbery. In a criminal case, a trial court, even in the absence of a request, must instruct the jury on lesser included offenses when the evidence raises a question as to whether all the elements of the charged offense were present and there is evidence justifying conviction of a lesser offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 160.) Instruction regarding a lesser included offense is not necessary where the evidence indicates the defendant was either guilty of the greater offense or was not guilty at all. (*People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1233; *People v. Kelly* (1990) 51 Cal.3d 931, 958.)

Robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211; *People v. Gomez* (2008) 43 Cal.4th 249, 254.) "A

16

conspiracy is an agreement by two or more persons to commit an offense with the specific intent to commit the elements of the offense, coupled with an overt act by one or more of the conspirators in furtherance of the conspiracy." (*People v. Tran* (2013) 215 Cal.App.4th 1207, 1221.) The agreement may be a tacit understanding. (*Ibid.*) The existence of a conspiracy may be inferred from the conduct, relationship, and interests of the alleged conspirators before and after the alleged conspiracy. (*Ibid.*)

Theft is a lesser included offense of robbery. (*People v. Ledesma* (2006) 39 Cal.4th 641, 715.) Robbery has the elements of theft plus an additional element, use of force or fear. (*People v. Ortega* (1998) 19 Cal.4th 686, 694.)

The evidence in this case indicates defendants conspired to commit robbery and nothing less; alternatively stated, the evidence does not support defendants conspired to commit petty theft. On the night of the robbery, she purposely switched her shift duties so she was responsible for Taco Bell's doors, allowing Hernandez to gain unforced entry. She had expressly rejected the idea of leaving her cash register out; at the same time, she would have known he could not access the locked safe if the employees completed their closing procedures and left the premises. Therefore, Hernandez had to enter Taco Bell while employees were still inside, when he could command them to open the safe for him. His gun and mask sufficiently inspired fear and compliance by the innocent employee while providing Aguilar with a cover story. There would be no patrons inside the restaurant by timing the robbery close to 10:00 p.m.

In a case involving robbery, one court aptly observed, "Conspiracy to commit a crime is rarely proved as the result of testimony as to the text of a written or oral

17

agreement." (*People v. Mares* (1975) 51 Cal.App.3d 1013, 1021.) "[T]he emergence of the existence of a conspiracy was the result of a succession of events . . . [s]uch is the history of the discovery of most conspiracies to commit crime." (*Id.* at p. 1022.) The trial court had no sua sponte duty to instruct the jury on conspiracy to commit petty theft.

D. Receiving Stolen Property

Hernandez contends the trial court erred by not sua sponte instructing the jury on the offense of receiving stolen property (§ 496, subd. (a)) as a lesser included offense of robbery. He argues the Legislature's 1992 amendments to section 496, which abrogated the common law rule and provided that a thief may be convicted of receiving property he stole,[5] should be harmonized with the statutory elements test.

For purposes of determining the court's instructional duty, " 'a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' " (*People v. Smith* (2013) 57 Cal.4th 232, 240.) It is undisputed in this case that the prosecutor did not charge Hernandez with the elements of receiving stolen property and the accusatory pleading test is not met.

Based on a comparison of their statutory elements, receiving stolen property is not necessarily included in the offense of robbery. (§§ 211 [prohibits the "taking" of

---

[5]     See *People v. Allen* (1999) 21 Cal.4th 846, 857 (*Allen*) ["[a]fter the 1992 amendment, 'the fact that the defendant stole the property no longer bars a conviction for receiving, concealing or withholding the same property' "].

18

personal property], 496, subd. (a) [prohibits "buy[ing]" or "receiv[ing]" stolen property]; see *People v. Spicer* (2015) 235 Cal.App.4th 1359, 1372.) The Legislature's 1992 amendments to section 496 discussed in *Allen*, *supra*, 21 Cal.4th at page 857, did not change the basic proposition that an act of *receiving* stolen property is distinct from *taking* personal property, for the purpose of jury instructions. (§ 496; see, e.g., *In re Christopher S.* (1985) 174 Cal.App.3d 620, 624 ["the crime of receiving stolen property is aimed at the 'fence,' not the thief"].) The offense of robbery does not include all the elements found in the offense of receiving stolen property and, thus, the latter is not necessarily included in the former.

"[A] defendant has no right to instructions on lesser related offenses even if he requests the instruction and it would have been supported by substantial evidence. [Citation.] California law does not permit a court to instruct on an uncharged lesser related crime unless agreed to by the prosecution." (*People v. Valentine* (2006) 143 Cal.App.4th 1383, 1387.)

Hernandez did not request an instruction on receiving stolen property and the People did not agree to one. Also, the record does not support Hernandez's guilt of merely receiving stolen property. The trial court had no duty to give that instruction.

### III

### *Cumulative Error*

Defendants contend their convictions should be reversed based on cumulative errors by the trial court. Based on our review of the record, none of the errors, individually or cumulatively, undermined the essential fairness of defendants' trial. Their

19

convictions were supported by substantial evidence, and a more favorable result was not reasonably possible.

IV

*Sufficiency of Evidence to Support the Use of a Firearm*

Hernandez, joined by Aguilar, contends the evidence was insufficient to support his use of an "actual" firearm during the robbery. In reviewing a criminal conviction challenged as lacking evidentiary support, we review the record " ' "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Maury* (2003) 30 Cal.4th 342, 396.) The same standard of review applies to cases in which the prosecution relies on circumstantial evidence. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) We must accept logical inferences that the jury might have drawn from the circumstantial evidence. (*Ibid.*)

Hernandez acknowledges Mancilla's testimony is sufficient evidence, standing alone, to establish his use of a firearm. Nevertheless, he urges us to consider evidence of a carbon dioxide gas cartridge found in Aguilar's black SUV, which can be used in BB or pellet guns.[6] We reject his attempts to reargue or reweigh the evidence. Mancilla was an eyewitness and victim of the robbery. She reported and described a "gun" in her 911 call, repeated her report to multiple officers, as well as testified to the fact at trial. Her

---

6    No gun, real or not, was ever located.

20

descriptions of the gun were consistent. Mancilla's observation was credible given that Hernandez was masked, issuing threats, and committing a robbery inside a public restaurant. Sufficient evidence supported Hernandez's use of a firearm during the robbery. (See *People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1435 ["[d]efendant was not engaged in a childhood game of cops and robbers; the robbery was real, and the evidence supports a reasonable inference that the pistol he used was a real firearm, not a toy"].)

V

*Victim Restitution*

Hernandez argues for the first time on appeal that he should be jointly and severally liable with Aguilar for $750 of direct victim restitution ordered by the trial court to compensate for economic losses. (§ 1202.4, subd. (a).) Aguilar joins in his argument. The current judgments appear to require $750 to be collected from both Hernandez and Aguilar for direct victim restitution. The probation officer's report shows victim restitution was based on a total of $750 in stolen cash reported by Taco Bell's owner. Thus, $750 was the total amount of claimed economic losses (not two times $750). Despite defendants' failure to object to the restitution orders at trial, we will modify the judgments to make clear that defendants are jointly and severally liable for $750 of direct victim restitution. (See *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535.)

DISPOSITION

The judgments against both Hernandez and Aguilar are modified to provide expressly that defendants are jointly and severally liable for $750 of direct victim

21

restitution (§ 1202.4, subd. (a)).  The judgments are otherwise affirmed as modified.  The trial court is directed to amend the abstracts of judgment to reflect these modifications and to forward certified copies of the amended abstracts to the Department of Corrections.  (§§ 1213, 1216.)


McDONALD, Acting P.J.

WE CONCUR:


IRION, J.


PRAGER, J.*

---

*     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.